# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **FAUSTINO SANCHEZ CARRERA,** et al., | * |
| **Plaintiffs** | * |
| **v.** | * |
| **EMD SALES, INC., et al.,** | * |
| **Defendants** | * |

**CIVIL NO. JKB-17-3066**

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

Plaintiffs Faustino Sanchez Carrera, Jesus David Muro, and Magdaleno Gervacio filed suit against Defendants E.M.D. Sales, Inc. ("EMD"), E&R Sales and Marketing Services, Inc. ("E&R"), and Elda M. Devarie, alleging a violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA" or "the Act"), for failure to pay overtime wages. Plaintiffs seek back wages, liquidated damages, costs and reasonable attorneys' fees, and a permanent injunction to prevent Defendants from continuing to violate the FLSA. 29 U.S.C. §§ 216(b), 217. Now pending before the Court are Defendants' Motion for Summary Judgment (ECF No. 97), Plaintiffs' Cross-Motion for Partial Summary Judgment (ECF No. 104), Plaintiffs' Motion to Seal Exhibit 15 of Plaintiffs' Motion for Partial Summary Judgement (ECF No. 106), and Plaintiffs' Motion to Strike Defendants' Summary Judgment Exhibits G9, G10, G11 and G12 in their entirety and Exhibit G ¶¶ 14–17 (ECF No. 109). No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, the Defendants' Motion for Summary Judgment will be granted in part and denied in part, Plaintiffs' Cross-Motion for Partial Summary Judgment will be denied,

1

Plaintiffs' Motion to Seal will be denied, and Plaintiffs' Motion to Strike will be granted in part and denied in part.

## I. Background

Mr. Carrera and Mr. Gervacio are sales representatives for EMD, a company that distributes Latin American, Caribbean, and Asian food products to stores throughout the Washington metropolitan area. (Def. M.S.J. Mem. at 1, ECF No. 97-1; Pl. M.S.J. Exh. 1 ¶ 1, Exh. 7 ¶ 1, ECF. No. 104.) Mr. Muro worked as an EMD sales representative until August 2017. (Pl. M.S.J. Exh. 8 ¶ 1.) Elda Devarie is EMD's President and Chief Executive Officer. (Def. M.S.J. Exh. A at 4.) Ms. Devarie also owns E&R, a separate company which provides EMD with merchandising services once EMD delivers products to its customers. (Def. M.S.J. Mem. at 3; Pl. M.S.J. Mem. at 6, Exh. 16 at 36, ECF No. 108.) Plaintiffs allege that Defendants failed to pay them overtime wages pursuant to the FLSA. Defendants argue that Plaintiffs are subject to the FLSA's outside sales exemption, which exempts employees from overtime pay so long as their primary duty is making sales and they generally work outside of the office in furtherance of those sales. 29 C.F.R. § 541.500(a).

Sales representatives at EMD are represented by the United Food and Commercial Works Union, Local 400 ("Union"). (Def. M.S.J. Mem. at 2, Exh. B.) As provided in the Union Agreement negotiated between the Union and Ms. Devarie, a sales representative's entire salary derives from commissions for the sale of EMD products. (Def. M.S.J. Exh. B at 12.) Sales representatives spend most of their time outside of the office visiting the stores on their route, and EMD does not track the hours sales representatives work. (Def. M.S.J. Mem. at 5, Exh. B at 12; Pl. M.S.J. Exh. 16 at 42, 45.) Twice a week, EMD holds conference calls for the sales representatives, which "are directed at specific EMD products that should be pushed by the outside

sales representatives and other issues designed to help the sales representatives increase their sales of EMD products to their customers." (Def. M.S.J. Exh. G ¶ 8.) Sales representatives also attend a sales meeting at EMD every three weeks, which includes information on new EMD products and products EMD is "pushing" to stores, as well as updates on sales representatives' personal sales performance. (*Id.* ¶ 7.)

EMD provides food products to independent stores as well as larger chain stores, such as Walmart and Giant Food. (*See, e.g.*, Pl. M.S.J. Exh. 2 ¶ 4, Exh. 12.) EMD's sales representatives can try to open new accounts by pitching EMD products to independent stores, thereby adding stores to their sales route and increasing their sales. (*See* Pl. M.S.J. Exh. 1 ¶ 31; Def. M.S.J. Exh. C at 120:3–9.) At chain stores, by contrast, other EMD employees, including Ms. Devarie and her son, Roberto Devarie, establish the initial business relationship and negotiate floor space for EMD products at that time. (Pl. M.S.J. Exh. 1 ¶ 7. *See also* Pl. M.S.J. Exh. 2 ¶ 12, Exh. 3 ¶ 12.) In addition to sales representatives, EMD also employs key account managers, who negotiate prices and space allotments with EMD's chain store customers. (Pl. M.S.J. Exh. 1 ¶ 7.) Key account managers also work to convince chain stores to purchase new products from EMD in addition to those they already sell. (*Id.*) At chain stores, the role of the sales representative is to arrange products, stock and condition shelves, take orders for new products, and try to obtain more space for EMD on the salesfloor and thereby sell more products. (Pl. M.S.J. Exh. 1 ¶¶ 3–7, Exh. 11.)

While it is undisputed that EMD sales representatives have unlimited ability to sell EMD products to independent stores (*see* Pl. M.S.J. Exh. 16 at 72), the parties dispute whether sales representatives can sell additional products or gain additional shelf space at chain stores. Chain stores rely on planograms, which are detailed maps of the products on the salesfloor, to determine what products to sell and where to place these products in the store. (*See e.g.*, Pl. M.S.J. Ex. 2 ¶ 6

(discussing planograms at Giant Food), Exh. 12 ¶ 15 (discussing planograms at Walmart), Exh. 3 ¶ 17 (discussing planograms at Safeway).) These planograms are created at the corporate level, and store managers have little to no leeway to alter the placement or mix of products as dictated by the planogram. (*See, e.g.*, Pl. M.S.J Ex. 2 ¶¶ 13, 15–16, Exh. 12 ¶ 15, Exh. 3 ¶ 17.) Accordingly, Plaintiffs state that only in "rare" situations are sales representatives able to negotiate for more space to sell additional products at chain stores. (Pl. M.S.J. Mem. at 4; *see* Pl. M.S.J. Exh. 7 ¶ 7.) Instead of making their own sales at chain stores, Plaintiffs state that they are simply taking orders to restock products or refill space that was already sold by another EMD employee. (Pl. M.S.J Exh. 1 ¶¶ 4–5, Exh. 7 ¶¶ 4–5, Exh. 8 ¶¶ 4–5.) Plaintiffs explain that over the last five years they have spent at least 97% of their time servicing chain stores, and that over 96% of their total product volume ordered and stocked during this time has derived from these chain stores. (Pl. M.S.J. Exh. 1 ¶ 2, Exh. 7 ¶ 2, Exh. 8 ¶ 2, Exh. 9.) Therefore, Plaintiffs argue, their ability to secure any sales on their own is extremely limited. (Pl. M.S.J. Mem. at 3–4.)

Defendants contest this characterization of the sales representative's job and provide declarations from other sales representatives stating that they have been successful in negotiating additional space for EMD products in chain stores. (Def. M.S.J. Exh. D at 45–49.) Juan Pablo Barreno, who has been a sales representative at EMD for twenty years, testified he spends 80% of his time on sales, and only 20% on "packing up" tasks. (*Id.* at 164:1–2.) He testified that building relationships with store managers has helped him to sell more EMD products. (*Id.* at 161–63.) Another sales representative, Mayra Palma, testified that her relationship with the grocery manager also enabled her to gain additional display space for EMD products at Giant Food. (Def. M.S.J. Exh. F at 62–64.) Mr. Barreno explained that while his ability to place more products on the shelf at chain stores is limited due to planograms, he is not limited in his ability to order additional

products for the floor. He explained that while the shelves can only hold so much product, "we can create more space if we want," and "if we can create a secondary location, then we can send one case, twenty, thirty cases." (Def. M.S.J. Exh. D at 153–54.) Mr. Barreno did note, however, that over the last few years stores have started reducing the amount of "back stock" they will hold for the floor (*id.* at 154–55), making this more difficult.

The crux of the parties' dispute is whether the primary duty of sales representatives is to make sales. (Def. M.S.J. Mem. at 3; Pl. M.S.J. Mem. at 3.) Plaintiffs state their primary duty is not making sales, but rather is "perform[ing] labor–intensive promotional activities which are incidental to sales made by other EMS personnel at chain stores, such as re–stocking, ordering and perform[ing] related functions, including replenishing depleted product, physically stocking product, conditioning space, and writing credits for expired or damaged product they remove." (Pl. M.S.J. Mem. at 3–4; *see also* Pl. M.S.J. Exh. 1 ¶ 5, Exh. 11 at 9.) Defendants state that the primary duty of sales representatives is making sales and that they are "responsible for the sale of EMD products in their assigned stores." (Def. M.S.J. Mem. at 3.)

## II. *Evidentiary Issues*

Before the Court considers the merits of the parties' cross-motions for summary judgment, the Court first considers the parties' challenges to the proffered evidence.

### a. *Plaintiffs' Motion to Strike*

Plaintiffs have filed a motion to strike Exhibits G9–G12 and parts of Exhibit G from Defendants' motion for summary judgment and supporting memorandum of law. (Pl. Mot. Strike, ECF No. 109.) Exhibit G9 is a spreadsheet titled "Total Sales Reps – Total Accounts," which contains the total dollar amount of sales representatives' product sales for 2015 to 2018. (ECF No. 97-18.) Exhibit G10 is a report on sales representatives' gross wages for 2015 to 2018 which

contains data on sales representatives' commissions during those years. (ECF No. 97-19.) Exhibit G11 is a sales report for another sales representative, Miguel Perez, for the years 2014 to 2017. (ECF No. 97-20.) Exhibit G12 is an email from Ivan Aguilar (an EMD employee) to Elda Devarie and Carmen Perez (another EMD employee) containing what is purportedly a list of new stores opened by the three Plaintiffs. (ECF No. 97-21.) Plaintiffs argue that these exhibits should be excluded under Federal Rule of Civil Procedure 37 and Federal Rule of Evidence 1006. Defendants argue that these exhibits are properly admissible business records.

Plaintiffs also argue that Exhibit G ¶¶ 14–17, the Affidavit of Freddy Urdaneta Olivares (ECF No. 97-9), should be stricken because they contain lay opinion testimony which is not based on Mr. Urdenata's personal knowledge, in violation of Federal Rule of Evidence 701. (Pl. Mot. Strike Mem. at 8–9.) Defendants contest this characterization of Mr. Urdenata's affidavit and state that his responsibilities as EMD's Sales Director demonstrate that he has personal knowledge about the statements contained in his affidavit. (Mot. Strike Resp. at 3–4, ECF No. 110.) The Court will address each of these challenges in turn.

### 1. Exhibits G9–G11

Plaintiffs argue that Exhibits G9–G11 should be stricken because Defendants refused to provide discovery into sales and commissions made by sales representatives other than Plaintiffs during discovery, even though Plaintiffs specifically asked for this information. (Pl. Mot. Strike Mem. at 1, 3.) Rule 37(c) states: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Though Defendants argue in response that these exhibits should be admitted as

6

business records (Mot. Strike. Resp. ¶ 11), Rule 37 contains no exception for business records.[1]

Fed. R. Civ. P. 37.

Exclusion of evidence does not require "a finding of bad faith or callous disregard of the discovery rules." *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003). Though district courts have "broad discretion" to decide whether a failure to disclose was substantially justified or harmless, the Fourth Circuit has held courts "should" consider five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*Id.* at 597. As the parties who declined to disclose this information during discovery, Defendants bear the burden to establish that nondisclosure was substantially justified or harmless. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).

During discovery, Plaintiffs specifically asked for documents containing information on sales representatives' commissions and sales. (Pl. Mot. Strike Mem. at 3.) Defendants argue that the information contained in Exhibits G9–11 is not a surprise because Plaintiffs "had ample opportunity to and did discover this information through the voluminous ESI discovery that occurred in this case." (Mot. Strike Resp. ¶ 3.) In support of this, Defendants cite to the affidavit of Nicholas Blackmore, attached as Exhibit 10 to Plaintiffs' cross-motion for summary judgment. (Pl. M.S.J. Exh. 10.) Mr. Blackmore explains how he made certain calculations based on "an Excel file" Defendants produced which contained data related to sales made by sales

---

[1] Though Defendants state that Exhibits G9, G10, and G12 are business records (Mot. Strike. Resp. ¶ 11), the Court believes Defendants meant to refer to Exhibit G11 and not Exhibit G12. Regardless, because business records are not excluded from the dictates of Rule 37, the typo is of no import.

representatives from 2014 to 2015. (*Id.* ¶¶ 5–6.) As Plaintiffs highlight, Mr. Blackmore's affidavit refers to one document with information from 2014 to 2015. (Mot. Strike Reply at 1–2.) Defendants do not assert that any other information related to non-Plaintiff sales representatives' sales or commissions was produced during discovery, nor do they identify any documents they produced which contain such information. Instead, Defendants argue that Plaintiffs could have deposed other sales representatives on these topics. (Mot. Strike Resp. ¶ 10.) Not only did Plaintiffs not have access to the data in question during the depositions, but discovery had also been "effectively limit[ed] . . . to the Plaintiffs only" and Defendants affirmatively redacted information about other sales representatives' sales from the documents they did provide during discovery. (Mot. Strike Reply at 3, Ex. B, Ex. C, Ex. D; Order, ECF No. 38.) The Court therefore finds that the factor of surprise argues in favor of exclusion of these exhibits.

Defendants do not address any of the remaining factors. Defendants have not offered any explanation for their failure to disclose this information prior to the close of discovery and the filing of summary judgment motions, which argues strongly in favor of exclusion. Nor have Defendants addressed the ability of Plaintiffs to cure the surprise, which Plaintiffs assert would require re-opening discovery and further delaying adjudication of this case. (Pl. Mot. Strike Mem. at 4). Defendants also failed to address the disruption to the trial schedule that would result from permitting such evidence to be introduced at this point. While there is no trial scheduled at this time, Defendants did not produce this information until they filed their opening summary judgment motion. Potentially re-opening discovery and allowing supplemental briefing would likely delay the trial in this matter, but since there is no trial date set this factor only leans slightly in favor of exclusion. *See e.g.*, *Jones v. Chapman*, Civ. No. ELH-14-2627, 2017 WL 2266221, at *6–7 (D. Md. May 24, 2017) (finding no abuse of discretion in striking an expert report produced seven

8

months before trial but only two weeks before summary judgment motions); *MCI Commc'ns Servs., Inc. v. Am. Infrastructure-MD, Inc.*, Civ. No. GLR-11-3767, 2013 WL 4086401, at *9 (D. Md. Aug. 12, 2013) (finding this factor was "split" between the two parties when information was first produced "in the midst of competing cross-motions for partial summary judgment" but no trial date had been set). Lastly, Defendants fail to address the relative importance of the evidence at issue. Based on the Court's review of the record, the Court does not find that these exhibits are dispositive or would alter its conclusions. Other admissible exhibits contain general information on sales representatives' sales and commissions, which are sufficient to inform the court that sales representatives' commissions vary based on the products they sell. (*See, e.g.*, Def. M.S.J. Exh. B at 12.)

Defendants have failed to address most of the factors that courts consider in determining whether to exclude evidence. Accordingly, the Court finds that Defendants have failed to meet their burden to demonstrate Exhibits G9–11 should not be excluded under Rule 37.[2] Because Defendants have not shown their failure to produce this information during discovery was substantially justified or harmless, the Court will grant Plaintiffs' motion to strike Exhibits G9–G11 to Defendants' motion for summary judgment.

### 2. *Exhibit G12*

Exhibit G12 is an email from EMD employee Ivan Aguilar to Elda Devarie and another EMD employee. Mr. Aguilar's email contains several charts with data about new accounts opened by the three Plaintiffs. Mr. Aguilar writes, "Below you will find all the stores that were open in Retalix for each sales rep." (Def. M.S.J. Exh. G12 at 1.) Defendants do not provide a certification from Mr. Aguilar. Instead, Defendants rely on a supplemental affidavit from EMD's Sales

---

[2] Because the Court strikes these exhibits under Federal Rule of Civil Procedure 37, it does not need to address whether such records would be inadmissible under Rule 1006.

Director, Mr. Urdaneta, to certify this document. (Mot. Strike Resp. at 3, Exh. H.) In his supplemental affidavit, Mr. Urdaneta states that "[Mr.] Aguilar specifically references that the information was obtained through 'Retalix' which is a software application that EMD uses to manage its data base [sic]. Information in EMD's data base, like the information in Aguilar's e-mail to Ms. Devarie, and the e-mail is kept in the ordinary course of business and is accurate and reliable as a business record." (*Id.* Exh. H ¶ 6.)

Plaintiffs argue that Exhibit G12 should be stricken because it is an unauthenticated, unsworn statement. (Pl. Mot. Strike Mem. at 6, 8.) However, exhibits need not be in admissible form to be considered at summary judgment, provided they could be put in admissible form. Fed. R. Civ. P. 56(c)(2); *Kurland v. ACE Am. Ins. Co.*, Civ. No. JKB-15-2668, 2017 WL 354254, at *3 n.2 (D. Md. Jan. 23, 2017). Here, Plaintiffs do not allege that Exhibit G12 could not be made admissible by trial, nor do Defendants provide any information suggesting they would be unable to properly authenticate this information. Because nothing suggests this information could not be put in an admissible form at trial, the Court denies Plaintiffs' motion to strike Exhibit G12.[3]

### 3. Exhibit G

Plaintiffs have also asked the Court to strike four paragraphs of Freddy Urdaneta's affidavit (Def. M.S.J. Exh. G). Plaintiffs argue that these paragraphs contain lay opinion testimony which is not based on Mr. Urdaneta's personal knowledge. (Pl. Mot. Strike Mem. at 8–9.) It is well established that "summary judgment affidavits cannot be conclusory or based upon hearsay."

---

[3] Defendants argue that Exhibit G12 is admissible as a business record. However, the mere fact that this email was sent within a business is not sufficient to qualify it as a business record. *United States v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013). In addition, nothing in Mr. Urdaneta's affidavit suggests compiling a report like the one contained in Exhibit G12 about the three Plaintiffs is a routine business practice at EMD, as opposed to something done solely for litigation. *See Certain Underwriters at Lloyd's v. Sinkovich*, 232 F.3d 200, 205 (4th Cir. 2000) ("The absence of trustworthiness is clear . . . when a report is prepared in the anticipation of litigation because the document is not for the systematic conduct and operations of the enterprise but for the primary purpose of litigating."). Regardless, the Court need not address this argument because it finds that there is no reason the email could not be put in admissible form at trial.

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citations omitted). Mr. Urdaneta's affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Mr. Urdaneta is the Sales Director and former Marketing Manager for EMD. (Def. M.S.J. Exh G ¶ 2.) In this role, he says he is "familiar with the various sales activities that EMD uses to help support its outside sales representatives sell more EMD products to independent stores and supermarket chains, cash and carry wholesalers and restaurants." (*Id.* ¶ 3.) Mr. Urdaneta explains he is "personally familiar with the sales efforts and performance of the Outside Sales Representatives who work at EMD," and "[t]he performance of the Outside Sales Representatives are regularly reviewed in EMD's Sales Meetings and weekly conference calls." (Mot. Strike Resp. Exh. H ¶ 3.) Mr. Urdaneta also explains, "[a]s EMD's Sales Director, on a regular basis, I review the individual sales performance of the individual Outside Sales Representatives by tracking their sales through EMD's sales records . . . I can and do use information from that data base to track an individual's sales to EMD's customers." (*Id.* at ¶ 4.)

This Court has held that an "affiant's personal knowledge may be based on review of files, if the testimony states facts reflected by the files and does not give 'inferences, opinions and surmises.'" *Howard Acquisitions, LLC v. Giannasca New Orleans, LLC*, Civ. No. WDQ-09-2651, 2010 WL 3834917, at *3 (D. Md. Sept. 28, 2010) (quoting *Lee v. N.F. Invests., Inc.*, Civ. No. 99-426, 2000 WL 33949850, at *5 n.2 (E.D.Mo. Mar.15, 2000)). However, the Fourth Circuit has cautioned that affidavits based on the review of documents have "questionable value" where there is not "direct, personal knowledge of the underlying facts." *Sutton v. Roth*, 361 F. App'x 543, 550 n.7 (4th Cir. 2010).

As explained above, the Court excludes Exhibits G9–G11 from consideration under Rule 37. Accordingly, the Court will also exclude Exhibit G ¶¶ 14–16 to the extent the information within those paragraphs is based on Exhibits G9–G11 and not Mr. Urdaneta's personal knowledge. Fed. R. Civ. P. 37(c). On separate grounds, the Court also strikes Mr. Urdaneta's statement in ¶ 15: "If all of the outside sales representatives were only performing the same merchandising services, there would not be such a wide variation in the annual commissions earned by the outside sales representatives." (Def. M.S.J. Exh. G ¶ 15.) Mr. Urdaneta stated during his deposition that he does not track what component of sales representatives' sales derive from their own personal efforts versus those that derive from the efforts of other EMD employees to negotiate space or sales. (Pl. M.S.J. Exh. 29 at 77.) Accordingly, the Court will strike this portion of ¶ 15 on the separate ground that it is a lay opinion not based on Mr. Urdaneta's personal knowledge as required by Federal Rule of Civil Procedure 56.

The Court declines to strike Exhibit G ¶ 17, which contains information about the new accounts opened by Plaintiffs as listed in Exhibit G12. As explained above, the Court found that the information in Exhibit G12 may be made admissible for trial. *Supra* 9–10. Mr. Urdaneta's testimony in ¶ 17 "states facts reflected by the files." *Howard Acquisitions*, Civ. No. WDQ-09-2651, 2010 WL 3834917, at *3. Mr. Urdaneta states that Plaintiffs opened a certain number of new accounts, as provided in Exhibit G12, which provide "opportunities to sell additional EMD products and increase [their] commission[s]." (Def. M.S.J. Exh. G ¶ 17). In ¶ 9, Mr. Urdaneta explains that sales representatives' "commission payments [are] based on the Collective Bargaining Agreement EMD has with the Union. The more EMD products they sell, the more commissions they earn." (*Id.* ¶ 9.) Mr. Urdaneta also establishes through his job description as

Sales Director that he has personal knowledge about sales representatives' general performance. Accordingly, the Court declines to strike ¶ 17.

In summary, the Court will grant Plaintiffs' motion to strike Exhibits G9–G11 and Exhibit G ¶¶ 14–16 to the extent these paragraphs are based on information from Exhibits G9–G11 and not on Mr. Urdaneta's personal knowledge. The Court will also strike the last sentence of ¶ 15 because it is not based on Mr. Urdaneta's personal knowledge. The Court will deny Plaintiffs' motion to strike Exhibit G12 and Exhibit G ¶ 17.

### 4. *Plaintiffs' Exhibits 2, 3, 4, 5, 6, 10, 12, and 13*

Defendants also claim that Plaintiffs' Exhibits 2, 3, 4, 5, 6, 12, and 13 are inadmissible because they are not based on the declarants' personal knowledge. (Def. M.S.J. Reply at 9–12.) Rule 56 requires that affidavits submitted in support of summary judgment motions be based on personal knowledge and "show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[S]tatements based solely on information and belief" are not sufficient to meet the standards of Rule 56. *Cottom v. Town of Seven Devils*, 30 F. App'x 230, 234 (4th Cir. 2002). Affidavits "contain sufficient information . . . to establish that the affiants' statements [a]re made based on personal knowledge" where the affidavits contain "a description of the affiants' job titles and duties" and there is no evidence the "affiants were not competent to testify." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 135 n.9 (4th Cir. 2002). There is no requirement affidavits specifically state they are based on personal knowledge when these requirements are met. *Id.*

Defendants first claim that Exhibits 2–6 and 12–13 are not based on the personal knowledge of the declarant. Defendants state that these affidavits contain some identical language and it is "clear" they were prepared by attorneys and not the declarants themselves, citing to

13

specific passages in Exhibits 4, 5, 6, 12, and 13.[4] (Def. M.S.J. Reply at 9–10.) However, "most declarations submitted in connection with civil litigation in state and federal courts are prepared by attorneys for clients and witnesses, and thereafter executed by the clients and/or witnesses under penalty of perjury." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 959 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), *and aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017); *see also, Kourouma v. Holder*, 588 F.3d 234, 242–243 (4th Cir. 2009) (finding no impact on credibility where asylum applicant's affidavit was substantially similar to that of a separate applicant). Therefore, the fact that the declarations at issue here use similar language and may have been prepared by an attorney does not mean those affidavits are inaccurate or not based upon the declarants' personal knowledge, as required by Rule 56.

Second, Defendants claim that Exhibits 4 and 12 are inadmissible because the declarants state their testimony is based on "my understanding," (Pl. M.S.J. Exh. 4 ¶ 13), and "information and belief" (Pl. M.S.J. Exh. 12 ¶¶ 12, 17), which Defendants argue is not the same as being based on personal knowledge. (Def. M.S.J. Reply at 10.) With regards to Exhibit 4, the Declaration of Robert Weschler, Mr. Weschler explains that it is his "understanding" that EMD sales representatives perform a variety of duties at Safeway stores, including writing orders, arranging EMD products, and ensuring EMD products are tagged with the correct price. (Pl. M.S.J. Exh. 4 ¶ 13). As Mr. Weschler explains earlier in his affidavit, he has worked for Safeway for approximately 40 years and has served as a store director for half of that time. (*Id.* ¶ 4.) Mr. Weschler states he has been familiar with EMD for five years and that EMD sends sales representatives to his store twice a week. (*Id.* ¶¶ 5, 11.) He also describes the work he has observed

---

[4] Defendants do not explain why Exhibits 2 and 3 fail to meet the Rule 56 standard.

EMD sales representatives doing and discusses how he places orders with them. (*Id.* ¶¶ 19–21.) Based on Mr. Weschler's job experience and history working with EMD, Mr. Weschler has established that his statements were based on personal knowledge.

In Exhibit 12, the Declaration of Jigsa Eshete, Mr. Eshete explains that he has been the general manager for a Walmart store since 2017, and prior to that served as a co-manager for six years. (Pl. M.S.J. Exh. 12 ¶ 3). He states he is "familiar with Iberia Foods," which "supplies products to my [s]tore," and that he has seen Mr. Carrera in his store "for the purpose of ordering, re-ordering and/or stocking the shelves with products supplied by Iberia Foods."[5] (*Id.* ¶¶ 11, 13.) However, he states that he "had never heard of EMD" before being contacted for a deposition. (*Id.* ¶ 7.) Defendants challenge two paragraphs in Mr. Eshete's Declaration. Mr. Eshete states in his Declaration, "[b]ased on information and belief, Iberia Foods is a Direct Service Distribution . . . supplier that distributes or sells food and other related products to Walmart." (*Id.* ¶ 12). Mr. Eshete further states, "[b]ased on information and belief, Iberia Foods hires EMD Sales, Inc. as a third party vendor to service the space allotted to each of them." (*Id.* ¶ 17). Plaintiffs respond that Mr. Eshete's description of his overall job duties demonstrates that he has personal knowledge of the information contained in ¶¶ 12 and 17.

"[S]tatements based solely on information and belief do not satisfy the requirements of Rule 56." *Cottom*, 30 F. App'x at 234. Because ¶ 17 does not contain any information suggesting Mr. Eshete's statement about Iberia's relationship with EMD comes from his own knowledge and job experience—and he admits he had not heard of EMD prior to his involvement in this case— the Court finds that ¶ 17 is inadmissible. Similarly, the court finds that ¶ 12 is also inadmissible.

---

[5] Iberia Foods is food manufacturer and distributor. (Pl. M.S.J. Exh. 6 ¶ 4.) EMD purchases products from Iberia and then resells and distributes those products in the mid-Atlantic region. (*Id.* ¶ 5.) At Walmart, "Iberia develops and maintains an exclusive direct relationship and engages EMD to service the stores." (*Id.* ¶ 6.)

Mr. Eshete fails to explain how he had personal knowledge that Iberia Foods was a direct service distribution supplier, and instead relied "on information and belief" for this fact, in contravention of Rule 56. Though Mr. Eshete explains he is responsible for "overseeing the operations of the entire store" (Pl. M.S.J. Exh. 12 ¶ 4), and "for making sure that the entire [store] is properly and adequately stocked" (*id.* ¶ 6), nothing in his affidavit states that Mr. Eshete has knowledge about the distribution strategies used by companies supplying products to Walmart.

As to the general argument that Mr. Eshete's declaration is not based on personal knowledge because he had never heard of EMD prior to being contacted for a deposition, his statements are based on observations which did not require him to know for which company Mr. Carerra or the other EMD sales representatives he saw were employed. (*See, e.g., id.* ¶¶ 21, 24.) Therefore, it is clear the remainder of Mr. Eshete's declaration is based on his personal observations, and the fact that Mr. Eshete had not heard of EMD prior to his involvement in this case does not alter that conclusion.

If a portion of an affidavit is deemed inadmissible, the court may strike only that portion and admit the remaining admissible portions of the affidavit. *See Evans*, 80 F.3d at 962; Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2738 (3d ed. 2006) ("The court will disregard only the inadmissible portions of a challenged affidavit and consider the rest of it"). Therefore, the Court will only exclude ¶¶ 12 and 17 of Exhibit 12.

Third, Defendants argue that Exhibit 10, the affidavit of Nicholas Blackmore, cannot be admitted under Federal Rule of Evidence 1006 to authenticate the data summaries he created, attached as Tabs A–K of his affidavit. (Def. M.S.J. Reply at 10–11.) Defendants argue that Mr. Blackmore does not provide information about his "educational background or experience that would suggest, let alone establish, that he is competent to prepare" these summaries. (*Id.* at 10.)

However, there is no requirement that Plaintiffs provide this information in order for Tabs A–K to be admissible. Instead, Rule 1006 permits data summaries into evidence if 1) the data being summarized is "voluminous," 2) the summarization is "an *accurate* compilation of the voluminous records sought to be summarized," and 3) the underlying evidence being summarized is "otherwise admissible in evidence." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004).

In his affidavit, Mr. Blackmore lists the documents he received from the Defendants which he used in making his summaries. (Pl. M.S.J. Exh. 10 ¶¶ 2, 5.) In addition, he states that the order data he relied on was mailed to the Defendants on May 20, 2019. (*Id.* ¶ 18). Defendants do not contest that the order data on which Mr. Blackmore relied is voluminous, which is supported by Mr. Blackmore's assertion that the data contained thousands of rows of data. (*Id.* ¶¶ 4, 6.) Nor do Defendants argue that the data on which he relied would be inadmissible. Defendants only argue that Mr. Blackmore's summaries may not be accurate. However, not only does Mr. Blackmore clearly describe his process of calculation for the summaries provided in each Tab (*id.* ¶¶ 4, 6–17), but Mr. Blackmore also separately mailed the underlying documents to Defendants to enable them to check the accuracy for themselves (*id.* ¶ 18). Nothing in Defendants briefing suggests they have found any issues with the accuracy of Mr. Blackmore's calculations. Therefore, because Mr. Blackmore's affidavit establishes that the records he summarizes are voluminous, the summary is accurate, and the underlying records are otherwise admissible, Tabs A–K are admissible under Federal Rule of Evidence 1006.

In conclusion, the Court will strike ¶¶ 12 and 17 from Plaintiffs' Exhibit 12 to their cross-motion for summary judgment. The Court will also grant Plaintiffs' motion to strike with regards to Defendants' Exhibits G9–G11, as well as ¶¶ 14–16 of Exhibit G to the extent these paragraphs

17

rely on information from these stricken exhibits and not the declarant's personal knowledge. The Court will also strike the last sentence of Exhibit G ¶ 15.

The Court will now consider the merits of the parties' summary judgment briefings based on these rulings.

## III. Cross-motions for Summary Judgment

### a. Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Still, the opposing party must present those facts and cannot rest on denials. The opposing party must set forth specific facts, either by affidavit or other evidentiary showing, demonstrating a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Furthermore, the opposing party must set forth more than a "mere . . . scintilla of evidence in support of [his] position." *Anderson*, 477 U.S. at 252.

### b. Fair Labor Standards Act Liability

The FLSA was enacted in order to provide employees with certain protections against their employers. *See Morrison v. Cty. of Fairfax*, 826 F.3d 758, 761 (4th Cir. 2016). Pursuant to the Act, employers must "compensate employees for hours in excess of 40 per week at a rate of 1 ½ times the employees' regular wages." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (citing 29 U.S.C § 207(a)). Several job categories, including outside salesmen, are exempt from the FLSA's overtime requirements. 29 U.S.C.A. § 213. The FLSA defines "sale" as "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition," 29 U.S.C.A. § 203(k), but the Act does not directly define the term "outside salesman." *Christopher*, 567 U.S. at 147. Congress instead "delegated authority to the [Department of Labor (DOL)] to issue regulations" defining the term. *Id.* at 147.

The Supreme Court has identified three regulations that are "directly relevant" to the outside salesman exemption: the general regulation, the sales regulation, and the promotion-work regulation. *Id.* at 148. The general regulation states that an outside salesman is an employee:

> (1) Whose primary duty is: (i) making sales . . . or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500. In other words, "an outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." *Christopher*, 567 U.S. at 148. "The sales regulation restates the statutory definition of sale . . . and clarifies that '[s]ales within the meaning of [29 U.S.C. § 203(k)] include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property.'" *Id.* at 148–49 (quoting 29 C.F.R. § 541.501(b)).

19

"[T]he promotion-work regulation identifies '[p]romotion work' as 'one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed.'" *Id.* at 149 (quoting § 541.503(a)). "Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work," but "promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work." 29 C.F.R. § 541.503(a). Relevant to the case at hand, the DOL provides the following example of an individual whose work would not qualify as exempt under the outside salesman exemption:

> Another example is a company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases. *The arrangement of merchandise on the shelves or the replenishing of stock is not exempt work unless it is incidental to and in conjunction with the employee's own outside sales.* Because the employee in this instance does not consummate the sale nor direct efforts toward the consummation of a sale, the work is not exempt outside sales work.

29 C.F.R. § 541.503(c) (emphasis added). For Plaintiffs' work re-arranging, restocking, and removing products at chain stores to qualify as exempt, it must be incidental to their own sales.

The main disagreement in the cross-motions for summary judgment is about whether a sales representative's primary duty is sales. Primary duty is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). As the DOL has explained:

> Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and

the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b). If an employee spends more than half the time "performing exempt work," he "will generally satisfy the primary duty requirement." *Id.*

The Sixth Circuit has also identified 29 C.F.R. § 541.504, titled "Drivers who sell," as a relevant regulation when determining whether food product salesmen qualify as outside salesman. *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 582 (6th Cir. 2014). This regulation provides several factors for courts to consider when deciding whether drivers qualify for the outside sales exemption. 29 C.F.R. § 541.504(b). These factors include:

> a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales.

*Id.* Because DOL considers these factors relevant as to whether drivers qualify as outside salesman, this Court will also consider them in evaluating whether Plaintiffs qualify as outside salesmen and, consequently, are exempt.

The parties dispute the burden Defendants bear to demonstrate that the outside sales exemption applies to Plaintiffs. Defendants argue they need only prove the exemption applies by a preponderance of the evidence, and cite to *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018), for this proposition. (Def. M.S.J. Reply at 2.) However, nothing in the *Encino* decision relates to evidentiary burdens, nor does it even mention the phrase "preponderance of evidence."

21

Plaintiffs argue that Defendants must instead prove that the outside sales exemption applies by clear and convincing evidence. (Pl. M.S.J. Mem. at 16–17.) This is in line with longstanding Fourth Circuit precedent. *See, e.g., Jones v. Va. Oil Co.*, 69 F. App'x 633, 636 (4th Cir. 2003) ("An employer bears the burden of establishing by clear and convincing evidence that an employee qualifies for an exemption from FLSA's requirements.") (citing *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir.1993)). Multiple courts in this district have continued to apply the "clear and convincing" standard post-*Encino*, and this Court sees no reason to depart from that settled law. *See, e.g., Lovo v. Am. Sugar Ref., Inc.*, Civ. No. RDB-17-418, 2018 WL 3956688, at *7 (D. Md. Aug. 17, 2018), *appeal dismissed*, No. 18-2013, 2018 WL 7500305 (4th Cir. Sept. 21, 2018); *Estrada v. Ecology Servs. Refuse & Recycling, LLC*, Civ. No. GLR-17-496, 2018 WL 3458563, at *2 (D. Md. June 12, 2018).[6]

### c. Analysis

#### 1. Employer

To succeed on a FLSA claim, "a plaintiff must . . . show that he was 'employed' by the defendant/employer." *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986). The parties do not dispute that Plaintiffs were employed by EMD and Ms. Devarie. The parties do dispute whether Plaintiffs were employed by E&R. Plaintiffs state in a letter to Judge Coulson regarding a discovery dispute that Mr. Carrera "performed work for E&R in 2014 and 2015." (ECF No. 38-1 at 2.) However, Defendants stated in their interrogatory responses, under the penalty of perjury, that Plaintiffs never worked for E&R. (Def. M.S.J. Exh. A at 5). Plaintiffs' single statement in one letter about a discovery dispute is nothing more than a "scintilla of evidence," which provides

---

[6] Defendants argue that reliance on *Killion*, 761 F.3d 574, is misplaced because it employs the clear and convincing standard as opposed to the preponderance of evidence standard. As this Court explained, *Encino*, 138 S. Ct. 1134, did not alter the relevant evidentiary standard and therefore *Killion* remains persuasive authority. *Supra* 21–22.

insufficient grounds to deny a defendants' adequately supported summary judgment motion. *Anderson*, 477 U.S. at 252. Because there is no "evidence on which the jury could reasonably find for the plaintiff" on this issue, the Court grants Defendants' summary judgment motion as it relates to E&R. *Id.*

### 2. *Sales*

To qualify for the outside salesmen exemption, Plaintiffs must make sales as defined by the FLSA. *Christopher*, 567 U.S. at 148. There is ample evidence in the record that the sales representatives in this case do in fact make some sales. Sales representatives' salaries are based solely on commissions, which are derived from net sales of EMD products. (Def. M.S.J. Exh. B at 12.) In addition to servicing stores that already purchase EMD products, Ms. Devarie explained that sales representatives also pitch EMD products to new stores and therefore have "the opportunity to open as many accounts as he or she wishes." (Def. M.S.J. Exh. C at 120:3–9.) Ms. Devarie testified that how much sales representatives sell is based in part on their own efforts and is not based solely on the sales work of other EMD employees or dictated by a planogram. (*See* Def. M.S.J. Exh. C at 140:8–13 ("You can have a very good store with good velocity, and you can have a lousy sales representative that doesn't -- you know, is not motivated to sell much, and they will put a minimum number of cases in the store. Because they make the decision of how much to order."), 189:1–190:8 (describing the planogram as a "foot in the door" for a "great sales rep").) Mr. Barreno, an EMD sales representative of twenty years, testified that he spends 80% of his time on sales. (Def. M.S.J. Exh. D. 164:1.) Mr. Barreno also said that there are opportunities for sales representatives to secure additional space for EMD products at chain stores (*id.* at 154:11–14), and that he has personally been successful in doing so (*id.* at 97:8–21 (explaining that over half his revenue from one Shoppers store comes from extra space he has negotiated).)

Plaintiffs do not dispute that they make some sales, such as selling new products to independent stores. (Pl. M.S.J. Mem. at 9, Exh. 1 ¶ 31.) But while Plaintiffs acknowledge that sales representatives should attempt to secure more space for EMD products at the chain stores they service, they claim they are "almost never successful" in doing so (Pl. M.S.J. Mem. at 9). Furthermore, Plaintiffs argue that they are not making sales when they take orders to restock products in store space that was originally secured by other EMD employees. (*Id.* at 8.) Plaintiffs argue that these orders, as well as the associated product restocking and rearrangement, are incidental to sales made by others, and therefore do not qualify as outside sales under DOL regulations. *See* 29 C.F.R. § 541.503(c). Plaintiffs present affidavits from a range of chain store buyers which confirm that they have little to no discretion to grant EMD sales representatives more space for EMD products and are instead controlled by the already-negotiated planogram.[7] (Pl. M.S.J. Exhs. 4, 12, 13.)

In a similar case, the Sixth Circuit found that a jury could reasonably determine that individuals mainly placing orders for products in space that was already planogrammed were not making sales under the FLSA. *Killion,* 761 F.3d at 584. The plaintiffs in *Killion* were also permitted to "cold-call on smaller independent retailers and solicit them to purchase [defendants'] products." *Id.* at 578. Like Plaintiffs here, the plaintiffs in *Killion* alleged that they were "generally unsuccessful" in acquiring more space for products at planogrammed stores and stated that other employees were responsible for negotiating the planogrammed space in question. *Id.* at 584. The

---

[7] For example, Mr. Weschler, a store director for Safeway, states that, while the store is planogrammed, he has discretion to determine which products are displayed in forty "Shadowbox Displays" throughout his store. (Pl. M.S.J. Exh. 4 ¶¶ 8, 15.) However, he explains his discretion has "become more and more limited over the last three to five years" due to Safeway's decision to institute "Mandatory Displays" in his store. (*Id.* ¶ 16.) He also explains that his personal relationship with sales representatives has no bearing on his decisions to order additional products. (*Id.* ¶ 18.) Mr. Ramsawaksingh, a store manager at Giant Foods, explains that no store managers at his store may "entertain solicitations from representatives from EMD . . . or any other . . . Vendor/Supplier." (Pl. M.S.J. Exh. 13 ¶ 25.) Similarly, Mr. Eshete, a general manager at Walmart, states he does not have permission from Walmart "to entertain any solicitation" from EMD employees. (Pl. M.S.J. Exh. 12 ¶ 23.)

court observed, "The fact that the plaintiffs hit the order buttons on their electronic devices . . . is not enough to magically transform their jobs from inventory management to 'sales.'" *Id.*

At the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Here, Plaintiffs have presented compelling testimony from both EMD employees and chain store employees attesting to the difficulty if not impossibility for sales representatives to make sales at chain stores that are not merely incidental to the sales work of other EMD employees. However, viewing the evidence in a light most favorable to Defendants, the Court finds that Defendants have presented evidence—particularly testimony of other sales representatives—which creates a genuine dispute of fact on the issue of whether sales representatives are able to make sales at chain stores. Because it is not the job of the Court to weigh the evidence during summary judgment, the Court cannot decide as a matter of law that Plaintiffs are or are not making sales at chain stores. The Court therefore denies Defendants' and Plaintiffs' motions for summary judgment.

Because a genuine dispute exists regarding whether Plaintiffs are able to, and in fact do, make "sales" under the FLSA when they are taking orders at planogrammed chain stores, the Court is also unable to determine whether sales are a sales representatives' primary duty. If Plaintiffs are making sales when they take orders at chain stores, it may follow that the merchandising work they do, such as arranging products and cleaning up shelf space, would be incidental to their own sales, and therefore would be exempt outside sales work under the FLSA. In that case, it would seem clear that Plaintiffs' primary duty is making sales. If, on the other hand, Plaintiffs are effectively unable to acquire any additional space at chain stores for EMD products and are simply replenishing products that other EMD employees have already sold, then the fact that Plaintiffs

spend almost all their time servicing chain stores would suggest that sales are not Plaintiffs' primary duties. If this is the case, then the task for the factfinder would be to determine whether the fact that some sales representatives have made additional sales at chain stores transforms the job into one primarily concerned with sales. Based on the evidence presented to the Court, the Court finds it unlikely that Plaintiffs' primary duty is sales if the orders Plaintiffs make at chain stores do not qualify as "sales" under the FLSA.

Because there is a genuine dispute of material fact on the issue of whether Plaintiffs make sales when they take orders, and accordingly whether the primary duty of sales representatives is making sales, Plaintiffs' and Defendants' summary judgment motions on this issue will be denied.

### d. *Liquidated Damages*

The FLSA permits recovery of both unpaid wages and "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Liquidated damages for overtime violations are "the norm." *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997). However, courts have discretion under the FLSA to decline to award liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to [the violation] was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C.A. § 260. Determining whether an employer exercised good faith or had reasonable grounds for his belief that he was not in violation of the FLSA is an objective inquiry, 29 C.F.R. § 790.22, and "establishing either element is sufficient to satisfy the statute," *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 132 (4th Cir. 2015).

It is the employer's burden to demonstrate he is entitled to this defense. *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 375 (4th Cir. 2011). The employer has a "'substantial burden'" to show good faith or reasonable grounds for believing pay practices to be FLSA-compliant. *Brinkley-Obu*

*v. Hughes Training, Inc.*, 36 F.3d 336, 357 (4th Cir. 1994) (quoting *Richard v. Marriott Corp.*, 549 F.2d 303, 306 (4th Cir. 1977), *cert. denied*, 433 U.S. 915 (1977)). "'Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them." *Lockwood v. Prince George's Cty.*, 58 F. Supp. 2d 651, 658 (D. Md. 1999), *aff'd Lockwood v. Prince George's Cty.*, 217 F.3d 839 (4th Cir. 2000) (quoting *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir.1997)).

The record is clear Defendants knew about the existence of FLSA's exemption for outside sales representatives. (Def. M.S.J. Exh. C at 83–87.) The record is also clear that Ms. Devarie reviewed material from the DOL and relied on the advice of two accountants in determining that sales representatives were exempt outside salesmen under the Act. (*Id.*) However, Plaintiffs argue that Defendants failed to investigate the actual daily tasks of sales representatives, which prevented Defendants from accurately determining whether they were covered by the outside sales exemption. (Pl. M.S.J. Mem. at 34.). In addition, Plaintiffs state that even after Ms. Devarie became aware of Plaintiffs' challenges to their exemption status, she never hired an attorney to offer an opinion on the issue of exemption. (Pl. M.S.J. Reply at 17, Exh. D ¶ 5; Def. M.S.J. Exh. C at 100–03.)

Defendants assert that the fact EMD's pay practices were incorporated into a collective bargaining agreement is "dispositive on the question of an employer's good faith." (Def. M.S.J. Mem. at 28.) While the existence of a collective bargaining agreement is a factor to consider in determining whether a party exhibited good faith in complying with the FLSA, it is not the only relevant factor. Defendants' citation to *Koelker v. Mayor of Cumberland (Maryland)*, 599 F. Supp. 2d 624, 638 (D. Md. 2009) confirms as much. In *Koelker*, the court declined to award liquidated

damages due to "the complexity of the issues" involved, "the history of the collective bargaining agreements, and the fact that the City's compensation practice has been known to the parties for many years and the subject of bargaining." *Id.* The existence of the collective bargaining agreement was just one factor that ultimately tilted the court in the employer's favor. However, though the existence of a collective bargaining agreement is not dispositive, it should be granted substantial consideration in determining whether Plaintiffs should receive liquidated damages:

> While an employee cannot waive his right to overtime under the FLSA, the fact that Plaintiff agreed and understood that he could not claim unapproved overtime weighs heavily in the determination of fairness with regard to liquidated damages, as well as the employer's good faith in denying the overtime. An employee who has chosen to bypass a policy to which he has agreed should not obtain a premium on any recovered overtime payments.

*Ekeh v. Montgomery Cty.*, Civ. No. JKS-12-2450, 2016 WL 3523685, at *3 (D. Md. June 28, 2016).

Plaintiffs argue that Defendants' failure to seek advice from the DOL or an attorney with expertise on the FLSA demonstrates a lack of good faith, especially after Ms. Devarie received complaints from employees and this lawsuit was initiated. (*See* Pl. M.S.J. Mem. at 31; Pl. M.S.J. Reply at 17.) However, an employer "need not seek an opinion letter" from the DOL "to avoid paying liquidated damages later." *Roy v. Cty. of Lexington*, 141 F.3d 533, 548–49 (4th Cir. 1998) (citing *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984)). Nor must an employer always consult an attorney to be found to have acted in good faith. *See, e.g., Burnley*, 730 F.2d at 140 (sustaining finding that employer acted in good faith based on his "reliance on [industry] newsletters to keep informed of FLSA coverage combined with the transitory and marginal FLSA coverage" to which his business was subject). While this circuit has affirmed that consultation with an attorney

28

contributes to a finding of good faith, *see, e.g., Mountaire Farms*, 650 F.3d at 375–76, this Court declines to hold that the failure to consult an attorney automatically negates a finding of good faith.

Plaintiffs also argue that Defendants did not show good faith because Ms. Devarie said she did not know what Plaintiffs did on a day-to-day basis in their jobs. (Pl. M.S.J. Exh. 16 at 103:20–104:10.) Ms. Devarie explained that no one knows the answer to that question because Plaintiffs "are outside sales representatives, which manage their time, they manage the number of stores that they visit, the hours, and how they run them. So I don't know when they're starting and I don't know when they're finishing and I don't know how they run their route." (*Id.* at 104:4–10.) In other words, Ms. Devarie was not saying she did not know what sales representatives' duties were; rather, she did not know exactly how sales representatives spent time carrying out their duties each day. In addition, Ms. Devarie testified that she did discuss the "specific duties" of sales representatives with her accountant when originally determining whether they qualified under the outside salesman exemption. (*Id.* at 84:8–10.)

There are several factors contributing to a finding of good faith here, including the complexity of the issues involved, the fact that sales representatives' salaries resulted from negotiations with the Union, and Ms. Devarie's multiple consultations with accountants and review of the FLSA factsheet. While it would seem unlikely that a jury would find Defendants evinced a lack of good faith in failing to pay Plaintiffs overtime wages, the Court finds that Plaintiffs have raised a dispute of material fact based on Ms. Devarie's failure to investigate sales representatives' daily job responsibilities. Accordingly, the Court is unable to determine that no reasonable jury could find in favor of Plaintiffs on the issue of Defendants' good faith. The Court therefore denies the Defendants' and Plaintiffs' motions for summary judgment on this issue.

    *e.* ***Statute of Limitation***

The standard statute of limitation for FLSA claims is two years, but it is extended to three years for willful violations. 29 U.S.C. § 255(a). The issue of willfulness is typically a question of fact. *Calderon*, 809 F.3d 111, 130 (4th Cir. 2015). The burden is on the employee to prove willfulness, i.e., "that the employer 'knew or showed reckless disregard for the matter of whether its conduct'" violated the Act. *Mountaire Farms*, 650 F.3d at 375 (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). An employer recklessly disregards the Act's requirements "if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry." 29 C.F.R. § 578.3(c)(3). A "good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects" is not a willful violation. *Mould v. NJG Food Serv. Inc.*, 37 F. Supp. 3d 762, 772 (D. Md. 2014) (quoting *Richland Shoe*, 486 U.S. at 135). Mere negligence or unreasonableness does not establish willfulness without evidence of recklessness. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 358 (4th Cir. 2011) (citing *Richland Shoe,* 486 U.S. at 135); *Richland Shoe*, 486 U.S. at 135 n.13. Instead, a party demonstrates willfulness by "choosing to remain ignorant of legal requirements or by learning of those requirements and disobeying them." *Chao v. Self Pride, Inc.*, 232 F. App'x 280, 287 (4th Cir. 2007) (unpublished table decision).

The Court concludes that both Plaintiffs and Defendants failed to meet their burden to show that there is no genuine dispute of material fact as to whether Defendants' failure to pay overtime wages was willful. Though Ms. Devarie's failure to consult a lawyer after receiving complaints from Plaintiffs and her failure to thoroughly investigate the actual job duties of the sales representatives raise questions as to whether or not she recklessly disregarded the FLSA's requirements, the same evidence the Court identified as relevant to a finding of good faith creates a genuine dispute over Ms. Devarie's willfulness. The issue for the factfinder at trial will be to

determine how much Ms. Devarie knew about Plaintiffs' jobs, and whether that knowledge was sufficient to allow her to determine whether they were exempt outside salesmen. Accordingly, the Court denies Plaintiffs' and Defendants' summary judgment motions on the issue of willfulness.

## IV.   *Plaintiffs' Motion to Seal*

Plaintiffs have asked the Court to seal Exhibit 15 of Plaintiffs' Cross-Motion for Partial Summary Judgment. (Pl. Mot. Seal, ECF No. 106.) Plaintiffs state that Exhibit 15, the "Walmart Grocery Merchandise Agreement: General Supplier Information" between EMD and Walmart, contains confidential information, including "sensitive trade secrets or other confidential research, development, or commercial information" related to non-party Walmart. (*Id.* at 1–2.) Plaintiffs explain Exhibit 15 was marked as "Confidential" pursuant to the Court's Order Regarding Confidentiality of Discovery Material (ECF No. 59). (*Id.* at 1). Plaintiffs argue that no alternatives to sealing would provide "sufficient protection" because Walmart's "privacy interests substantially outweigh public disclosure." (*Id.* at 1–2.)

The public has a First Amendment right of access to documents submitted to a court in support of or in opposition to a motion for summary judgment. *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 578 (4th Cir. 2004) (citing *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)). Accordingly, the court must provide the public with "notice of the request to seal and a reasonable opportunity to challenge the request." *Washington Post*, 386 F.3d at 576. The proponent of sealing such documents must "articulate a compelling interest that outweighs the strong presumption of public access." *Doe v. Pub. Citizen*, 749 F.3d 246, 272 (4th Cir. 2014). The party requesting the sealing must provide specific reasons in support of its position, and the court must consider less drastic alternatives to sealing. *Washington Post*, 386 F.3d at 575–76. "A corporation may possess a strong interest in preserving the confidentiality

of its proprietary and trade-secret information, which in turn may justify partial sealing of court records." *Doe*, 749 F.3d at 269 (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)).

Here, Plaintiffs have not explained in any detail why redaction of sensitive portions of Exhibit 15 would be insufficient to provide Walmart with protection for its alleged trade secrets. Plaintiffs have also not provided specific reasons why all the information in Exhibit 15 must be sealed, beyond a general statement that Walmart has a privacy interest in its confidential material. While this may be true, the standard for sealing a document to which the public has a First Amendment right of access requires more information from Plaintiffs—specifically, exactly which elements and sentences of the document warrant sealing, and exactly why. Therefore, the Court will deny Plaintiffs' motion to seal.

## V. *Conclusion*

For the foregoing reasons, an Order shall enter granting in part and denying in part Defendants' Motion for Summary Judgment; denying Plaintiffs' Motion for Summary Judgment; granting in part and denying in part Plaintiffs' Motion to Strike; and denying Plaintiffs' Motion to Seal.

DATED this 20 day of August, 2019.

BY THE COURT:

James K. Bredar
Chief Judge