## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**FAUSTINO SANCHEZ CARRERA,**
**et al.,**                                             *

   **Plaintiffs**

   **v.**                                   *            **CIVIL NO. JKB-17-3066**

**EMD SALES, INC., et al.,**                           *

   **Defendants**                               *

  *    *    *    *    *    *    *    *    *    *    *    *

## <u>MEMORANDUM OPINION</u>

Plaintiffs Faustino Sanchez Carrera, Magdaleno Gervacio, and Jesus David Muro, current and former sales representatives at E.M.D. Sales, Inc. ("EMD"), claim that Defendants EMD and EMD Chief Executive Officer ("CEO") Elda M. Devarie failed to pay them overtime wages as required by the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* (the "FLSA" or the "Act").[1] Plaintiffs seek back wages, liquidated damages, costs and reasonable attorney's fees, and a permanent injunction to prevent Defendants from continuing to violate the FLSA.  (Second Am. Compl. at 6–7, ECF No. 169.)  Defendants argue that Plaintiffs are subject to the FLSA's outside sales exemption, which exempts employees from overtime pay so long as (1) their primary duty is making sales and (2) they generally work outside of the office in furtherance of those sales.  29 C.F.R. § 541.500(a).

The Court held a bench trial in this matter from March 1 through March 11, 2021.  Upon consideration of all the evidence presented, the Court finds that Defendants are jointly and

---

[1] Plaintiffs initially also named E&R Sales and Marketing Services, Inc. ("E&R") as a defendant in this case.  The Court granted E&R's motion for summary judgment (*see* ECF Nos. 114, 115), and accordingly, only EMD and Ms. Devarie remain as defendants.

severally liable to Plaintiffs for Defendants' failure to pay overtime wages.  Plaintiffs are entitled to liquidated damages because Defendants failed to demonstrate good faith or reasonable grounds for believing that their conduct was in accordance with the FLSA.  However, Plaintiffs did not demonstrate that Defendants' violation of the Act was willful, and as a result, Plaintiffs' claim is subject to the FLSA's standard two-year statute of limitations.  The Court denies Plaintiffs' request for a permanent injunction against Defendants.  In light of these rulings, the parties are directed to meet and confer and file a joint submission—to the extent they are able—briefing the Court regarding (1) damages, (2) pre- and post-judgment interest, and (3) costs and reasonable attorney's fees by March 26, 2021.

## I.    Key Findings of Fact[2]

Founded by Ms. Devarie in 1995 and incorporated in 1997, EMD distributes Latin American, Caribbean, and Asian food products to chain and independent grocery stores in the Washington, D.C. metropolitan area.  As a direct store delivery vendor, EMD delivers its products directly to stores and provides supplementary services, including stocking and conditioning shelves, at those stores.  In addition to Ms. Devarie, EMD's employees include about thirty-five sales representatives, seven key account managers, Marketing Manager Roberto Devarie, and Sales Director Freddy Urdaneta.  Ms. Devarie also owns E&R Sales and Marketing Services, Inc., a separate company that provides EMD with merchandising services after EMD delivers products to its customers.  Mr. Carrera and Mr. Gervacio are current sales representatives at EMD, and Mr. Muro was a sales representative at EMD until August 2017.

Plaintiffs testified that they regularly work—or worked, in Mr. Muro's case—around sixty hours per week as sales representatives.  EMD assigns each of its sales representatives a sales route

---

[2] An official transcript of the proceedings at trial is not yet available.  Accordingly, in summarizing its findings of fact, the Court draws from its internal record of the testimony and evidence presented.

comprised of both chain and independent stores and a personal digital assistant ("PDA") device, which allows them to place orders for EMD products.  EMD does not track the hours that sales representatives work, and based on Defendants' stipulation to Plaintiffs' Exhibits 7, 8, and 9, Defendants apparently do not dispute Plaintiffs' testimony about their hours.  Sales representatives are not paid an hourly wage.  Instead, pursuant to collective bargaining agreements negotiated by the United Food and Commercial Works Union, Local 400 (the "Union") and EMD, sales representatives' compensation is based entirely on commissions on sales of EMD products.  (*See* Pl. Exs. 82, 83.)

By all accounts, sales representatives spend most of their time outside of EMD's main office servicing stores on their routes, but the parties dispute whether sales representatives' primary duty is to make sales of EMD products.  Plaintiffs testified that sales representatives' primary responsibility is essentially inventory management, with daily tasks including re-stocking, replenishing depleted products, removing damaged and expired items from the shelves, and issuing credits to the serviced stores for removed items.  By contrast, Ms. Devarie and other members of EMD's management emphasized that the main responsibility of sales representatives is to sell EMD products.  Being a sales representative, Mr. Urdaneta explained, requires leveraging relationships with store managers and knowledge about stores to make sales of additional products.  Ms. Devarie and Mr. Urdaneta both framed their testimony in aspirational terms—emphasizing that the main limitation on sales representatives' ability to sell is their own initiative.  Even so, Ms. Devarie acknowledged that she does not know how sales representatives allocate their time across the various stores on their routes.

Sales representatives are subject to minimal oversight by EMD.  One of the few mechanisms by which EMD provides its sales representatives with regular feedback is through a

color-coding system on the PDA devices—which indicates a sales representative's performance based on orders placed for EMD products—on a scale from green (high) to red (low). Mr. Urdaneta testified that Mr. Gervacio and Mr. Carrera are both generally between green and yellow, and that when Mr. Muro was employed by EMD, he was generally between yellow and red. Sales representatives may also be subject to suspension for failing to service their stores, according to the testimony of members of EMD's management.

A core issue in the parties' dispute is whether sales representatives can make their own sales of EMD products at chain stores, which comprise at least half of Plaintiffs' business, based on the testimony of Ms. Devarie, Plaintiffs, and other sales representatives. EMD establishes its business relationships with chain stores at the highest levels of its organization, through meetings between key account managers or members of EMD's management and chain store corporate category buyers. At these meetings, EMD representatives persuade chain stores to buy their products and negotiate quantity, price, and other terms. These initial meetings are critical for a couple of reasons, according to the testimony of chain store corporate representatives. First, they allow vendors to introduce new items to chain stores, which cannot sell items that have not been entered into the store's inventory system and received a stock keeping unit ("SKU") number. Second, these meetings allow vendors to negotiate product placement in a chain store's merchandising plan, which is highly detailed and set by corporate representatives.

The testimony of current and former chain store corporate category buyers and store managers served by EMD, including Walmart, Safeway, Giant Food, and Shoppers Food, established that chain store managers are given "planograms,"[3] which are detailed diagrams indicating where to place items on shelves, and plans for non-planogrammed movable displays.

---

[3] Walmart's "modulars" are synonymous with "planograms."

Both in policy and practice, store managers are not permitted to deviate from the planogram or order additional displays, according to Cynthia Volk, a former category buyer at Giant Food, and Christopher Krawchuk, a former category manager at Safeway.  Walmart store manager Jigsa Eshete and Giant Food store manager Stephen Ramsawaksingh likewise testified that they are not empowered to grant requests to place products in spaces beyond those in the planogram or requests for additional movable displays.  Accordingly, the testimony of Mr. Eshete and Mr. Ramsawaksingh suggests that chain store managers would not be receptive to solicitations by EMD sales representatives to buy additional products beyond the plan set forth by corporate.

For their part, Defendants contend that there are abundant opportunities for sales representatives to make their own sales in chain stores.  For instance, EMD sales representative Mayra Palma testified that the goal of a sales representative at a chain store is to make additional sales beyond what EMD's management has already negotiated, and EMD sales representative Juan Pablo Barreno testified that he has been successful in negotiating additional shelf space for EMD products at Giant Food, Walmart, and Shoppers Food.  Likewise, EMD sales representative Maria de Lourdes explained that she always tries to negotiate for more space at chain stores.  Defendants also rely on the *de bene esse* deposition testimony of Tanjulan Major, a former buyer at Walmart for Prep Sauces and Dressings, who testified that although Walmart store managers are not supposed to make changes to the modular plan, sometimes they do.  Ms. Major highlighted the impracticality of chain store corporate representatives monitoring store managers' compliance with modular plans, explaining that she did not have control over 4,700 Walmart stores nationwide. The Court accredits this testimony as establishing that in some instances, at certain stores, there may be some divergence between corporate policy and practice such that chain store managers may not always follow planograms and plans for movable displays.

By contrast, EMD's relationship with independent stores is much less structured and generally involves fewer levels of the corporate hierarchy.  Sales representatives are encouraged to open new accounts and to increase both the type and quantity of EMD products sold by existing accounts.  In fact, Mr. Muro testified that he recalled adding an independent store as an EMD client by stopping by that store on his sales route.   However, Mr. Muro testified that, although independent store managers were not subject to the same ordering restrictions as chain store managers, he was often unsuccessful at selling to independent stores because they lacked the storage space to buy in bulk from EMD.

## II.    The Fair Labor Standards Act

The primary purpose of Congress in enacting the FLSA was "to protect all covered workers from substandard wages and oppressive working hours." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981).  Pursuant to the Act, employers must "compensate employees for hours in excess of 40 per week at a rate of 1 ½ times the employees' regular wages." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (citing 29 U.S.C § 207(a)).

Several categories of employees, including outside salespersons, are exempt from the FLSA's overtime requirements.  29 U.S.C.A. § 213.  The rationale underlying the outside sales exemption is that an outside salesman is unrestricted in the hours he works, and accordingly, is free to earn as much or as little as his ability and ambition allow.  *See Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir. 1941).  Further, practically speaking, the outside salesman "is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day.  To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman." *Id.* at 208.

6

The term "outside salesman" is not defined by statute; instead, Congress "delegated authority to the [Department of Labor (DOL)] to issue regulations" defining the term. *Christopher*, 567 U.S. at 147. The Supreme Court has identified three regulations that are "directly relevant" to the outside salesman exemption: the general regulation, the sales regulation, and the promotion-work regulation. *Id.* at 148. The general regulation states that an outside salesman is an employee:

> (1) Whose primary duty is: (i) making sales . . . or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500. In other words, "an outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." *Christopher*, 567 U.S. at 148. The parties in this case dispute both whether Plaintiffs make sales within the meaning of the FLSA, and if so, whether making sales is Plaintiffs' primary duty.

The sales regulation provides that the FLSA's definition of "sales" "include[s] the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property." *Id.* at 148–49 (quoting 29 C.F.R. § 541.501(b)).

"[T]he promotion-work regulation identifies '[p]romotion work' as 'one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed.'" *Id.* at 149 (quoting 29 C.F.R. § 541.503(a)). "Promotional work that is actually performed incidental to and in conjunction with *an employee's own outside sales* or solicitations is exempt work," but "promotional work that is incidental to *sales made, or to be made, by someone else* is not exempt outside sales work." 29 C.F.R. § 541.503(a) (emphases added). Relevant to the case at hand, the DOL provides the

following example of an individual whose work would not qualify as exempt under the outside salesman exemption:

> Another example is a company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases. *The arrangement of merchandise on the shelves or the replenishing of stock is not exempt work unless it is incidental to and in conjunction with the employee's own outside sales.* Because the employee in this instance does not consummate the sale nor direct efforts toward the consummation of a sale, the work is not exempt outside sales work.

29 C.F.R. § 541.503(c) (emphasis added).  Accordingly, for Plaintiffs' work of re-arranging, restocking, and removing products at chain stores to qualify as exempt, it must be incidental to their work of directly making sales.

The DOL defines a "primary duty" as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  As the DOL has explained:

> Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*  "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee."  29 C.F.R. § 541.700(b).  If an employee spends more than half of his or her time "performing exempt work," he or she "will generally satisfy the primary duty requirement."  *Id*.

The Sixth Circuit has also identified 29 C.F.R. § 541.504, titled "Drivers who sell," as a relevant regulation when determining whether food product salespersons are subject to the FLSA's

outside sales exemption. *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 582 (6th Cir. 2014). This regulation identifies relevant factors:

> [A] comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales.

29 C.F.R. § 541.504(b). This Court will consider these factors in evaluating whether Plaintiffs qualify as outside salespersons and, consequently, are exempt from the FLSA's protection.

### III.  *Analysis*

Plaintiffs brought suit against Defendants for failure to pay overtime wages under the FLSA. (*See* Second Am. Compl. ¶ 17, ECF No. 169.) To succeed on a FLSA claim, a plaintiff must (1) establish that he was employed by the defendant, (2) demonstrate that he worked overtime hours for which he was not properly compensated, and (3) prove the amount and extent of his overtime work as a matter of just and reasonable inference. *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). Upon such a showing by Plaintiffs, the burden shifts to Defendants "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88.

Apparently, the parties do not dispute that Plaintiffs established the three elements of a FLSA claim. The parties agree that all three Plaintiffs have at one time been employed by EMD as sales representatives and that Defendants do not pay sales representatives overtime wages. Additionally, the Court finds that Plaintiffs bear their burden of establishing both that they worked overtime hours without proper compensation as well as the amount and extent of such overtime

work as a matter of just and reasonable inference.  Indeed, at trial Defendants stipulated to Plaintiffs' Exhibits 7, 8, and 9, which detail the hours that each Plaintiff worked per week for the relevant time period.  The Court construes Defendants' stipulation as confirming the *accuracy* of Plaintiffs' representations with respect to how many hours they worked per week.  Even to the extent that Defendants do not stipulate to the accuracy of these figures, however, the Court finds that Plaintiffs' evidence regarding the amount and extent of their overtime is accurate because Defendants submit nothing to rebut Plaintiffs' evidence.

### A.  The Outside Sales Exemption

Defendants argue that they are not required to pay Plaintiffs overtime wages because Plaintiffs constitute outside salespersons and are thus exempt from the Act's overtime wage requirement.  Defendants bear the burden of demonstrating the applicability of the FLSA's outside sales exemption by clear and convincing evidence.  *See Jones v. Va. Oil Co.*, 69 F. App'x 633, 636 (4th Cir. 2003).  Indeed, in pleading an exemption to the FLSA, "the employer bears not only the burden of proof, but also the burden on each element of the claimed exemption." *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004) (internal citation omitted).

In order to determine whether Plaintiffs are outside salespeople for purposes of the FLSA, the Court considers (1) whether Plaintiffs make sales in their roles as sales representatives, and (2) whether making sales is Plaintiffs' primary duty.

The Supreme Court has explained that the Act's definition of "sales" is broad and encompasses all "arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity." *Christopher*, 567 U.S. at 164.  In *Christopher v. SmithKline Beecham Corporation*, the Supreme Court determined that pharmaceutical sales representatives constitute outside salespersons for purposes of the FLSA upon a finding that their primary duty is to

"[o]btain[] a nonbinding commitment from a physician to prescribe one of respondent's drugs." *Id.* at 165.  Other courts have explained, however, that "[t]he unique regulatory environment of the pharmaceutical industry makes evident why *Christopher*'s holding does not readily transfer to other industries."  *See, e.g.*, *Hurt v. Commerce Energy, Inc.*, 973 F.3d 509, 519 (6th Cir. 2020).

This Court finds *Killion v. KeHE Distributors, LLC* instructive.  761 F.3d 574 (6th Cir. 2014).  In that case, the Sixth Circuit found that the district court erred in determining that the plaintiffs were outside salespeople as a matter of law, where the plaintiffs were at the bottom of a four-tiered structure of employees involved in selling the defendant's products at chain stores.  *Id.* at 584.  The plaintiffs were responsible for determining the quantities of products to order as well as writing and transmitting orders for subsequent delivery.  *Id.*  As in the case at bar, the plaintiffs in *Killion* "presented substantial evidence that the [defendant's] account managers actually control the volume through 'plan-o-grams' and restrictions on reordering," and that the plaintiffs were generally not able to order products beyond what had already been arranged by the defendant's account managers.  *Id.*  The court found that in such circumstances, "[t]he fact that the plaintiffs hit the order buttons on their electronic devices . . . is not enough to magically transform their jobs from inventory management to 'sales.'"  *Id.*; *see also Hurt v. Com. Energy, Inc.*, 973 F.3d 509, 518 (6th Cir. 2020) (quoting *Christopher*, 567 U.S. at 149) (cautioning that "exempt status should not depend on technicalities, such as 'whether it is the sales employee or the customer who types the order into a computer system and hits the return button' or whether the order is filled by a jobber rather than directly by the employer")).

Further, the *Killion* court found that, even assuming the plaintiffs made their own sales, selling was not the plaintiffs' primary duty because "it appear[ed] that the vast majority of the plaintiffs' time [was] spent stocking and cleaning shelves."  *Killion*, 761 F.3d at 585.  Further,

memoranda produced by the defendant's management indicated that those plaintiffs' responsibilities included ordering products; stocking products; maintaining backroom conditions; removing expired products from the shelves; reconciling invoices; and reviewing products that went out of stock. *Id.* The Sixth Circuit found that, "[f]rom this broad range of responsibilities alone," a fact-finder could conclude that the plaintiffs' primary duty was not making sales. *Id.*

### 1. *Making Sales*

Upon consideration of the evidence in this case, the Court finds that, although Defendants established by clear and convincing evidence that Plaintiffs make sales at independent stores, Defendants do not carry the same burden with respect to whether Plaintiffs make their own sales at chain stores. The Court concludes that merely submitting orders on PDA devices to fill planogrammed space or to stock displays that were already negotiated by EMD's management and chain stores' corporate representatives does not constitute a sale for purposes of the FLSA. On the other hand, a Plaintiff would make his own sale if he placed an order for EMD products beyond the scope of such high-level negotiations—either by selling a new *type* of product or by selling products *outside* of the spaces already negotiated by EMD's management. Defendants concede that chain store managers are never able to sell new *types* of products without first clearing them with their corporate offices and receiving the requisite SKU number. However, Defendants point to the testimony of other sales representatives, EMD's management, and Ms. Major to support their argument that sales representatives regularly sell additional products beyond the planograms and displays negotiated by EMD's management at chain stores. This proof is rebutted by the testimony of other chain store corporate representatives, including Ms. Volk from Giant Food and Mr. Krawchuk from Safeway, and store managers, such as Mr. Eshete from Walmart, who all testified that chain stores' corporate offices afford store managers no leeway to stray from the

planogram or to set up unsanctioned displays.  Based on all this evidence, the Court finds that Defendants have demonstrated that there is a *possibility*—but not clear and convincing evidence— that sales representatives can make their own sales at chain stores.

### 2. *Primary Duty*

Although Defendants established that Plaintiffs do make their own sales at independent stores and might make some of their own sales at chain stores, Defendants have failed to demonstrate by clear and convincing evidence that Plaintiffs' *primary duty* as sales representatives is making sales at either chain stores or independent stores.  By contrast, consideration of all the evidence presented in this case suggests that sales representatives are tasked primarily with executing the terms of sales that were previously made by EMD's management and key account managers.  The Court accredits Plaintiffs' testimony with demonstrating that sales representatives are primarily occupied with keeping shelves full, keeping shelves clean, and placing orders promptly.  The fact that sales representatives are subject to suspension for failure to carry out these duties further illustrates that EMD regards servicing stores as a key responsibility of sales representatives.   Indeed, EMD's commission scheme for sales representatives does not differentiate between orders placed to fill chain store space previously negotiated by EMD's management and orders for space beyond what was negotiated by EMD's management.  This suggests that, although EMD would undoubtedly welcome the efforts of its sales representatives to sell products beyond the planogrammed spaces in chain stores, such efforts are ancillary to sales representatives' primary responsibility: ensuring that EMD receives the full benefit of the bargain obtained by EMD's key account managers and management.

Further, Plaintiffs' stocking and shelf-conditioning efforts do not constitute exempt work for purposes of the promotion-work regulation.  *See* 29 C.F.R. § 541.503(a).  Rather, as the Court

noted previously, *see supra* Part III.A.1, these responsibilities appear to be incidental to sales that were already negotiated and executed by EMD's key account managers or management.

At independent stores, the Court finds that, although making sales could theoretically be the primary duty of some sales representatives, Defendants did not demonstrate by clear and convincing evidence that this is *Plaintiffs'* primary duty.  In any event, based on Plaintiffs' testimony, the Court finds that they spend or spent the bulk of their time at chain stores. Accordingly, even if Defendants had proven by clear and convincing evidence that making sales is Plaintiffs' primary duty at independent stores, this would not suffice to establish that Plaintiffs' *overall* primary duty as EMD sales representatives is to make sales.

### B.  *Liquidated Damages*

The FLSA permits recovery of both unpaid wages and "an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  When a plaintiff prevails on a FLSA claim, awarding liquidated damages is "the norm."  *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997).  A court may refuse to order liquidated damages only if the defendant meets his burden of demonstrating "to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]."  29 U.S.C. § 260.  Courts "place a 'plain and substantial burden' upon the employer" to make this statutory showing.  *Mayhew*, 125 F.3d at 220 (quoting *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 357 (4th Cir. 1994)).  Determining whether an employer exercised good faith or had reasonable grounds for his belief that he was not in violation of the FLSA is an objective inquiry, 29 C.F.R. § 790.22, and "establishing either element is sufficient to satisfy the statute," *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 132 (4th Cir. 2015).

In order to demonstrate good faith, an employer may not simply show "ignorance of the prevailing law or uncertainty about its development." *Lockwood v. Prince George's Cnty.*, 58 F. Supp. 2d 651, 658 (D. Md. 1999), *aff'd Lockwood v. Prince George's Cnty.*, 217 F.3d 839 (4th Cir. 2000) (Table).  Rather, an employer must "first take active steps to ascertain the dictates of the FLSA and then move to comply with them." *Id.*; *see also Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 712 (E.D.N.C. 2009) (quoting *Roy v. Cnty. of Lexington,* 141 F.3d 533, 548 (4th Cir. 1998)) ("The good faith defense requires that an employer provide adequate proof that it did not take an 'ostrichlike' approach to the FLSA by 'simply remain[ing] blissfully ignorant of FLSA requirements.'").  Courts consider contextual factors that indicate an employer's objective good faith, including "the complexity of the issues, the history of the collective bargaining agreements, and the fact that the [defendant's] compensation practice has been known to the parties for many years and the subject of bargaining." *Koelker v. Mayor and City Council of Cumberland*, 599 F. Supp. 2d 624, 638 (D. Md. 2009).

The Court finds that Defendants have failed to carry their "substantial burden" of demonstrating good faith or objectively reasonable grounds.  Defendants point to the fact that Plaintiffs' commission-based compensation structure was negotiated by the Union, that Ms. Devarie relied on the advice of two accountants regarding the FLSA, and that she reviewed material from the DOL to establish that Defendants acted in good faith.  Defendants' failure to investigate the actual daily tasks of sales representatives, however, is dispositive to finding that Defendants acted in good faith or had reasonable grounds to believe that they were in compliance with the FLSA.   The Court determined that Ms. Devarie's testimony regarding sales representatives' duties was aspirational in nature and revealed her lack of knowledge as to what sales representatives' daily responsibilities actually entail.  Without having a concrete sense of

Plaintiffs' daily schedules, Defendants could not have objectively reasonable grounds for believing that sales representatives are covered by the FLSA's outside sales exemption. *See* 29 C.F.R. § 790.22. Accordingly, Plaintiffs are entitled to an award of liquidated damages under 29 U.S.C. § 216(b).

### C. *Statute of Limitations*

The standard statute of limitation for a FLSA claim is two years, but it is extended to three years for "a cause of action arising out of a willful violation." 29 U.S.C. § 255(a). To demonstrate willfulness, Plaintiffs bear the burden of proving that Defendants had actual or constructive notice "of the existence and general requirements of the FLSA." *Chao v. Self Pride, Inc.*, 232 F. App'x 280, 287 (4th Cir. 2007) (unpublished opinion). A violation is willful if an employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Mere negligence or unreasonableness, without evidence of recklessness, does not establish willfulness. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 358 (4th Cir. 2011) (internal citation omitted). Instead, a party demonstrates willfulness by "choosing to remain ignorant of legal requirements or by learning of those requirements and disobeying them." *Self Pride*, 232 F. App'x at 287.

Although the Court finds that Defendants' failure to investigate sales representatives' daily job responsibilities was unreasonable, *see supra* Part III.B, Plaintiffs do not demonstrate that such failure rose to the level of knowledge or reckless disregard such that Defendants' FLSA violation was willful. *See Desmond*, 630 F.3d at 358. The Court reaches this finding after careful consideration of the full trial record, and especially the testimony of Ms. Devarie, who was impermissibly but credibly uninformed on the topic of how the FLSA applied to her business. Her

error was one of neglect, not recklessness or willful misbehavior.  As a result, Plaintiffs' claims are subject to the FLSA's standard two-year statute of limitations.

## IV.    *Permanent Injunction*

In their Second Amended Complaint, Plaintiffs also sought a permanent injunction barring Defendants from committing further violations of the FLSA.  (Second Am. Compl. at 7.)  Plaintiffs did not raise this issue at the trial, but even if they had, the Act does not provide for "a private right of action to enjoin wage-and-hour violations and, to the contrary, grants all such authority to the Department of Labor."  *Mich. Corrs. Org. v. Mich. Dep't of Corrs.*, 774 F.3d 895, 903 (6th Cir. 2014).    Accordingly, the Court denies Plaintiffs' request for a permanent injunction against Defendants.

## V.    *Damages, Pre- and Post-Judgment Interest, and Costs and Reasonable Attorney's Fees*

In light of these rulings, the parties are directed to meet and confer and file a joint submission—to the extent they are able—briefing the Court regarding (1) damages, (2) pre- and post-judgment interest, and (3) costs and reasonable attorney's fees.  The parties' submission with respect to damages must include discussion of the time period during which damages should be awarded, the formula to be applied in calculating Plaintiffs' damages, and the amount of damages. Such briefing should reflect the Court's findings that Defendants are liable for liquidated damages, *see supra* Part III.B, and that Plaintiffs' claims are subject to the FLSA's standard two-year statute of limitations, *see supra* Part III.C.  The briefing must be confined to the evidence presented in Plaintiffs' Exhibits 7, 8, and 9, to which Defendants stipulated.  The parties shall file such joint submission by March 26, 2021.

## VI.  *Conclusion*

For the foregoing reasons, an Order shall enter finding that Defendants are liable to Plaintiffs under the Act, Plaintiffs are entitled to an award of liquidated damages, and Plaintiffs' claim is subject to the FLSA's standard two-year statute of limitations.  The Court denies Plaintiffs' request for a permanent injunction against Defendants.  In light of these rulings, the parties are directed to meet and confer and file a joint submission—to the extent they are able—briefing the Court regarding (1) damages, (2) pre- and post-judgment interest, and (3) costs and reasonable attorney's fees by March 26, 2021.

DATED this 19th day of March, 2021.

BY THE COURT:

_____/s/ JAMES K. BREDAR_____
James K. Bredar
Chief Judge