## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FAUSTINO SANCHEZ CARRERA, *et al.*,    *

     Plaintiffs,    *

v.    *    **CIVIL NO. JKB-17-3066**

E.M.D. SALES, INC., *et al.*,    *

     Defendants.    *

  *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

This case comes before this Court on remand. As relevant for purposes of the remand, after a bench trial, the Court entered judgment against Defendants E.M.D. Sales, Inc. ("EMD") and Elda M. Devarie in favor of Plaintiffs Faustino Sanchez Carrera, Jesus David Muro, and Magdaleno Gervacio. The crux of the dispute was—and on remand is—whether Plaintiffs were exempt outside salespeople and thus not entitled to overtime under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* (the "FLSA"). The Court concluded after trial that Defendants failed to prove by clear and convincing evidence that the Plaintiffs fell within the outside-salesperson exemption. (*See* ECF No. 219 at 9–14.) The Fourth Circuit affirmed. *Carrera v. E.M.D. Sales Inc.*, 75 F.4th 345 (4th Cir. 2023). The Supreme Court reversed, concluding that the preponderance of the evidence standard applies. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45 (2025). The Fourth Circuit remanded the case to this Court. (ECF No. 322, 324.)

On remand, the Court examines the record anew to determine whether Defendants established at trial that Plaintiffs were exempt by a preponderance of the evidence. It concludes that they did not.[1]

---

[1] Defendants seek a hearing. The Court concludes that no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2025).

## I. *Key Findings of Fact*

The Court previously made the following key findings of fact. Upon a renewed review of the evidence presented at trial, the Court finds the following facts by a preponderance of the evidence:

Founded by Ms. Devarie in 1995 and incorporated in 1997, EMD distributes Latin American, Caribbean, and Asian food products to chain and independent grocery stores in the Washington, D.C. metropolitan area. As a direct store delivery vendor, EMD delivers its products directly to stores and provides supplementary services, including stocking and conditioning shelves, at those stores. In addition to Ms. Devarie, EMD's employees include about thirty-five sales representatives, seven key account managers, Marketing Manager Roberto Devarie, and Sales Director Freddy Urdaneta. Ms. Devarie also owns E&R Sales and Marketing Services, Inc., a separate company that provides EMD with merchandising services after EMD delivers products to its customers. Mr. Carrera and Mr. Gervacio are current sales representatives at EMD, and Mr. Muro was a sales representative at EMD until August 2017.

Plaintiffs testified that they regularly work—or worked, in Mr. Muro's case—around sixty hours per week as sales representatives. EMD assigns each of its sales representatives a sales route comprised of both chain and independent stores and a personal digital assistant ("PDA") device, which allows them to place orders for EMD products. EMD does not track the hours that sales representatives work, and based on Defendants' stipulation to Plaintiffs' Exhibits 7, 8, and 9, Defendants apparently do not dispute Plaintiffs' testimony about their hours. Sales representatives are not paid an hourly wage. Instead, pursuant to collective bargaining agreements negotiated by the United Food and Commercial Work[er]s Union, Local 400 (the "Union") and EMD, sales representatives' compensation is based entirely on commissions on sales of EMD products. (*See* Pl. Exs. 82, 83.)

By all accounts, sales representatives spend most of their time outside of EMD's main office servicing stores on their routes, but the parties dispute whether sales representatives' primary duty is to make sales of EMD products. Plaintiffs testified that sales representatives' primary responsibility is essentially inventory management, with daily tasks including re-stocking, replenishing depleted products, removing damaged and expired items from the shelves, and issuing credits to the serviced stores for removed items. By contrast, Ms. Devarie and other members of EMD's management emphasized that the main responsibility of sales representatives is to sell EMD products. Being a sales representative, Mr. Urdaneta explained, requires leveraging relationships with store managers and knowledge about stores to make sales of additional products. Ms. Devarie and Mr. Urdaneta both framed their testimony in aspirational terms—emphasizing that the main limitation on sales representatives' ability to sell is their own initiative. Even so,

2

Ms. Devarie acknowledged that she does not know how sales representatives allocate their time across the various stores on their routes.

Sales representatives are subject to minimal oversight by EMD. One of the few mechanisms by which EMD provides its sales representatives with regular feedback is through a color-coding system on the PDA devices—which indicates a sales representative's performance based on orders placed for EMD products—on a scale from green (high) to red (low). Mr. Urdaneta testified that Mr. Gervacio and Mr. Carrera are both generally between green and yellow, and that when Mr. Muro was employed by EMD, he was generally between yellow and red. Sales representatives may also be subject to suspension for failing to service their stores, according to the testimony of members of EMD's management.

A core issue in the parties' dispute is whether sales representatives can make their own sales of EMD products at chain stores, which comprise at least half of Plaintiffs' business, based on the testimony of Ms. Devarie, Plaintiffs, and other sales representatives. EMD establishes its business relationships with chain stores at the highest levels of its organization, through meetings between key account managers or members of EMD's management and chain store corporate category buyers. At these meetings, EMD representatives persuade chain stores to buy their products and negotiate quantity, price, and other terms. These initial meetings are critical for a couple of reasons, according to the testimony of chain store corporate representatives. First, they allow vendors to introduce new items to chain stores, which cannot sell items that have not been entered into the store's inventory system and received a stock keeping unit ("SKU") number. Second, these meetings allow vendors to negotiate product placement in a chain store's merchandising plan, which is highly detailed and set by corporate representatives.

The testimony of current and former chain store corporate category buyers and store managers served by EMD, including Walmart, Safeway, Giant Food, and Shoppers Food, established that chain store managers are given "planograms,"[2] which are detailed diagrams indicating where to place items on shelves, and plans for non-planogrammed movable displays. Both in policy and practice, store managers are not permitted to deviate from the planogram or order additional displays, according to Cynthia Volk, a former category buyer at Giant Food, and Christopher Krawchuk, a former category manager at Safeway. Walmart store manager Jigsa Eshete and Giant Food store manager Stephen Ramsawaksingh likewise testified that they are not empowered to grant requests to place products in spaces beyond those in the planogram or requests for additional movable displays. Accordingly, the testimony of Mr. Eshete and Mr. Ramsawaksingh suggests that chain store managers would not be receptive to solicitations by EMD sales representatives to buy additional products beyond the plan set forth by corporate.

---

[2] Walmart's "modulars" are synonymous with "planograms."

3

For their part, Defendants contend that there are abundant opportunities for sales representatives to make their own sales in chain stores. For instance, EMD sales representative Mayra Palma testified that the goal of a sales representative at a chain store is to make additional sales beyond what EMD's management has already negotiated, and EMD sales representative Juan Pablo Barreno testified that he has been successful in negotiating additional shelf space for EMD products at Giant Food, Walmart, and Shoppers Food. Likewise, EMD sales representative Maria de Lourdes explained that she always tries to negotiate for more space at chain stores. Defendants also rely on the *de bene esse* deposition testimony of Tanjulan Major, a former buyer at Walmart for Prep Sauces and Dressings, who testified that although Walmart store managers are not supposed to make changes to the modular plan, sometimes they do. Ms. Major highlighted the impracticality of chain store corporate representatives monitoring store managers' compliance with modular plans, explaining that she did not have control over 4,700 Walmart stores nationwide. The Court accredits this testimony as establishing that in some instances, at certain stores, there may be some divergence between corporate policy and practice such that chain store managers may not always follow planograms and plans for movable displays.

By contrast, EMD's relationship with independent stores is much less structured and generally involves fewer levels of the corporate hierarchy. Sales representatives are encouraged to open new accounts and to increase both the type and quantity of EMD products sold by existing accounts. In fact, Mr. Muro testified that he recalled adding an independent store as an EMD client by stopping by that store on his sales route. However, Mr. Muro testified that, although independent store managers were not subject to the same ordering restrictions as chain store managers, he was often unsuccessful at selling to independent stores because they lacked the storage space to buy in bulk from EMD.

(ECF No. 219 at 2–6.) The Court describes additional facts developed at trial as necessary below.

## II.    Legal Standards

### A.  The FLSA and the Outside Salesman Exemption

The FLSA "generally requires overtime pay when a covered employee works more than 40 hours per week." *E.M.D. Sales*, 604 U.S. at 47 (citing 29 U.S.C. § 207(a)(1)). However, "the Act exempts many categories of employees from the minimum-wage requirement and exempts many more from the overtime-pay requirement." *Id.* at 48 (citing 29 U.S.C. § 213(a)–(b)). One such exemption is the outside salesman exemption. *See* 29 U.S.C. § 213(a)(1). "The law places the burden on the employer to show that an exemption applies." *E.M.D. Sales*, 604 U.S. at 48.

The employer must prove that the exemption applies by a preponderance of the evidence. *Id.* at 54.

"Congress did not define the term 'outside salesman,'" but the Department of Labor ("DOL") has promulgated relevant regulations. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012). The Supreme Court has identified three regulations that are "directly relevant" to the outside salesman exemption: the general regulation, the sales regulation, and the promotion-work regulation. *Id.* at 148.

The general regulation states that an outside salesman is an employee:

> (1) Whose primary duty is: (i) making sales . . . or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500. "Thus, under the general regulation, an outside salesman is any employee whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." *Christopher*, 567 U.S. at 148.

The sales regulation provides that the FLSA's definition of "sales" "include[s] the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property." *Christopher*, 567 U.S. at 148–49 (quoting 29 C.F.R. § 541.501(b)).

"[T]he promotion-work regulation identifies '[p]romotion work' as 'one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed.'" *Christopher*, 567 U.S. at 149 (quoting 29 C.F.R. § 541.503(a)). "Promotional work that is actually performed incidental to and in *conjunction with an employee's own outside sales or solicitations is exempt work,*" but "*promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work.*" 29 C.F.R. § 541.503(a) (emphasis added). The DOL provides the following

example of an individual whose work would not qualify as exempt under the outside salesman

exemption:

> Another example is a company representative who visits chain stores, arranges the
> merchandise on shelves, replenishes stock by replacing old with new merchandise,
> sets up displays and consults with the store manager when inventory runs low, but
> does not obtain a commitment for additional purchases. *The arrangement of*
> *merchandise on the shelves or the replenishing of stock is not exempt work unless*
> *it is incidental to and in conjunction with the employee's own outside sales.*
> Because the employee in this instance does not consummate the sale nor direct
> efforts toward the consummation of a sale, the work is not exempt outside sales
> work.

29 C.F.R. § 541.503(c) (emphasis added).

"The DOL provided additional guidance in connection with its promulgation of these

regulations, stressing that an employee is an outside salesman when the employee in some sense,

has made sales." *Christopher*, 567 U.S. at 142 (citation and internal quotation marks omitted).

The DOL defines a "primary duty" as "the principal, main, major or most important duty

that the employee performs." 29 C.F.R. § 541.700(a). As the DOL has explained:

> Determination of an employee's primary duty must be based on all the facts in a
> particular case, with the major emphasis on the character of the employee's job as
> a whole. Factors to consider when determining the primary duty of an employee
> include, but are not limited to, the relative importance of the exempt duties as
> compared with other types of duties; the amount of time spent performing exempt
> work; the employee's relative freedom from direct supervision; and the relationship
> between the employee's salary and the wages paid to other employees for the kind
> of nonexempt work performed by the employee.

*Id.* "The amount of time spent performing exempt work can be a useful guide in determining

whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b). If an

employee spends more than half of his or her time "performing exempt work," he or she "will

generally satisfy the primary duty requirement." *Id.* However, "[t]he regulations indicate that the

amount of time spent performing exempt sales work is useful, but not dispositive, in resolving an

employee's 'primary duty.'" *Dixon v. Prospect Mortg., LLC*, 11 F. Supp. 3d 605, 609 (E.D. Va.

6

2014). Indeed, the DOL "has concluded that selling or sales related activity outside the office only

'one or two hours a day, one or two times a week' can satisfy the second prong of the exemption."

*Id.* (citing DOL Wage Hour Op. Ltr. No. FLSA2007–2 (Jan. 25, 2007)).

Another regulation that provides helpful guidance in this case is 29 C.F.R. § 541.504. (*See,*

*e.g.*, ECF No. 335 at 14; ECF No. 334 at 9–10.) The regulation provides as follows:

> (a) Drivers who deliver products and also sell such products may qualify as exempt
> outside sales employees only if the employee has a primary duty of making sales.
> In determining the primary duty of drivers who sell, work performed incidental to
> and in conjunction with the employee's own outside sales or solicitations, including
> loading, driving or delivering products, shall be regarded as exempt outside sales
> work.

> (b) Several factors should be considered in determining if a driver has a primary
> duty of making sales, including, but not limited to: a comparison of the driver's
> duties with those of other employees engaged as truck drivers and as salespersons;
> possession of a selling or solicitor's license when such license is required by law
> or ordinances; presence or absence of customary or contractual arrangements
> concerning amounts of products to be delivered; description of the employee's
> occupation in collective bargaining agreements; the employer's specifications as to
> qualifications for hiring; sales training; attendance at sales conferences; method of
> payment; and proportion of earnings directly attributable to sales.

29 C.F.R. § 541.504.

To determine whether an employee is an outside salesperson, "the Court must look beyond

labels and descriptions and also inquire into the particular facts of the actual work performed."

*Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 756 (W.D. Mich. 2003). "Courts have articulated

various factors probative of an employee's status as an outside salesperson, including whether the

employee: must solicit new business; receives specialized sales training; was hired and

denominated as a salesperson; and whether the position was advertised as a sales position." *Id.*

(citing *Fields v. AOL Time Warner, Inc.*, 261 F.Supp.2d 971, 974 (W.D. Tenn. 2003)). "Other

indicia of sales-related activities . . . include commission compensation, specialized sales training,

and lack of direct or constant supervision." *Id.*

## B. Preponderance of the Evidence Standard

As noted above, the Court now assesses whether the Defendants have established the outside-salesperson exemption by a preponderance of the evidence, as opposed to the clear and convincing evidence standard.

> The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden to persuade the judge of the fact's existence.

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (citations, quotation marks, and alterations omitted).

The Court agrees with Defendants' contention that Plaintiffs "are entitled to no deference and no assumption that a finding in their favor presently exists." (*See* ECF No. 332 at 5–6.)

### III.   Analysis

Previously and now on appeal, there does not appear to be a dispute that Plaintiffs established the elements of an FLSA claim at trial. (ECF No. 219 at 9–10.)[3]  Rather, the issue is whether Defendants proved by a preponderance of the evidence that the outside salesperson exemption applied.  To determine whether Plaintiffs are outside salespeople for purposes of the FLSA, the Court considers (1) whether Plaintiffs make sales in their roles as sales representatives and (2) whether making sales is Plaintiffs' primary duty.  The Court previously assessed whether

---

[3] As the Court previously explained:

> To succeed on a FLSA claim, a plaintiff must (1) establish that he was employed by the defendant, (2) demonstrate that he worked overtime hours for which he was not properly compensated, and (3) prove the amount and extent of his overtime work as a matter of just and reasonable inference. *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). Upon such a showing by Plaintiffs, the burden shifts to Defendants "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88.

(ECF No. 219 at 9.)  The parties seem to agree that Plaintiffs have established the elements of an FLSA claim and that the only question is whether the outside sales exception applies.

8

Defendants had made this showing by clear and convincing evidence; it now assesses whether Defendants have made this showing by a preponderance of the evidence. The Court concludes that Defendants have not established by a preponderance of the evidence that the exemption applies.

## A. Making Sales

The Court now concludes that, although Defendants established by a preponderance of the evidence that Plaintiffs made their own sales at *independent* stores, they did not establish by a preponderance of the evidence that Plaintiffs made their own sales at *chain* stores. Rather, the evidence reflects that Plaintiffs' role at such stores was essentially inventory management, and that the sales negotiations occurred at a higher level at EMD—namely between key account managers, EMD's marketing personnel, and Ms. Devarie—and representatives from the chain stores. Plaintiffs did not, and indeed could not, sell products that were not approved at a higher level and did not negotiate the planograms (including the quantity or types of product included in the planograms).

There was evidence at trial that reflected a possibility that Plaintiffs (and other sales representatives) could make—or at a minimum influence—sales at chain stores. This evidence included testimony from Mr. Urdaneta, Mr. Devarie, Ms. Devarie, and certain sales representatives.[4] (*See, e.g.*, ECF No. 248 at 80 (Urdaneta testifying that "[a]s soon as the item is approved, the sky is the limit. They can sell, depend[s on] how aggressive the sales representative [is]."); ECF No. 231 at 34 (Mr. Devarie testifying that an individual store manager can decide that they want to sell a product without the involvement of corporate); ECF No. 232 at 78 (Ms. Devarie

---

[4] The Court notes that it does not find particularly compelling Defendants' contention that the various EMD employees who testified, such as Mr. Urdaneta and other sales representatives, "had no stake in the litigation" and were "disinterested." (*See* ECF No. 332 at 16, 25.)

testifying that sales representatives can ask for opportunities to sell with managers at chain stores); ECF No. 233 at 26–28 (Ms. Palma testifying that she offers more product to chain store managers, in addition to planogrammed space, and that she has been successful in doing so); *id.* at 47 (Ms. de Lourdes testifying that "[w]ith regard to the chain stores we always have to attend to the planograms that each different chain store has, but we always have the intention of increasing sales").)

However, the Court concludes that the countervailing evidence presented at trial that Plaintiffs could not make sales at chain stores was more compelling, and successfully rebutted Defendants' evidence. The Court especially credits the testimony of chain store representatives and managers—witnesses that the Court found to be credible and disinterested—which reflected that selling activity occurred not at the sales representative level, but at the key account manager level and above. For example, Mr. Krawchuck testified that he met with Ms. Devarie, Mr. Devarie, and Ralph Hill (a key account manager), not sales representatives (ECF No. 249 at 17), and that he—not store managers—made decisions about food placement (*id.* at 45, 52). Other chain store representatives testified similarly. (*See, e.g.*, ECF No. 230 at 27–28, 30 (Mr. Ramsawaksingh testifying that he does not decide what EMD products get sold in the store or how much of an EMD product gets sold in the store and that corporate makes decisions about what products to sell); ECF No. 255 at 102 (Ms. Volk testifying that she interfaced with key account manager Freddy Rincan, Ms. Devarie, and Mr. Devarie).) As did Plaintiffs. (*See, e.g.*, ECF No. 253 at 27 (Gervacio testifying that in all chain stores "all of the products already have been established . . . [a]nd the sales are already established by the key account managers.").)

The chain store representatives' testimony also reflected that planogrammed space was tightly regulated and store managers did not have the discretion to make changes to that space.

10

(*See, e.g.*, ECF No. 249 at 46 (Mr. Krawchuck testifying that there was no "play in the gears" when it came to space in Safeway and that "[e]verything should be planogrammed"); ECF No. 230 at 35 (Mr. Ramsawaksingh testifying that "it has to be on the plan, you know, because most of the space is all planogram[med] so we have to follow the plan" and that "[i]f it's not there, I'm the store manager that's not going to allow you to bring it in"); ECF No. 251 at 32–33, 36 (Mr. Eschete testifying that he is not authorized to discuss making modulars with Mr. Carrera or others, and that communications for about extra space would come from Walmart's "home office" to EMD, and that he is not allowed to permit extra displays); ECF No. 255 at 106, 110 (Ms. Volk explaining that, even for non-planogrammed movable displays, merchandising—not individual store managers—make decisions); *see also* ECF No. 256 at 26–27 (Mr. Muro testifying that he would ask for additional space at chain stores but was told that he was not going to get more space because that space was already designated).)

The Court also finds compelling the chain store representatives' view of the sales representatives' role. The chain store representatives viewed sales representatives' roles as essentially inventory management, including replenishing orders and cleaning shelves. (*See, e.g.*, ECF No. 249 at 55 (Mr. Krawchuck testifying that sales representatives write orders and stock the stores, but did not have other responsibilities); ECF No. 230 at 20–21 (Mr. Ramsawaksingh describing a sales representative as "the guy who writes the order and the guy who works the order," and describing "working the order" as putting the products on the shelves and cleaning); ECF No. 251 at 22 (Mr. Eschete testifying that Mr. Carrera does "the general ordering of the Iberia product, and then stocking," and that Mr. Carrera "make[s] sure that every products have been located with the right label and the right side," "tak[es] care of the outdated merchandise," and "clean[s] that area to make it look presentable for our customers").) The Court also credits the

testimony of the Plaintiffs that reflected that their roles were largely confined to inventory management. (*See* ECF No. 253 at 32–33 (Mr. Gervacio testifying that he cleans the shelves, restocks them, examines whether goods are expired, and writes up an additional order to fill the space already negotiated by EMD); ECF No. 254 at 75 (Mr. Carrera testifying that "my duties [were] to visit the stores, reorder depleted merchandise and front the shelves, clean the shelves. The shelf conditioning, what entails that is fronting, cleaning, dusting, wiping, writing credits").)

The Court recognizes that increasing sales to established customers could constitute sales for purposes of the FLSA. *See Hodgson v. Krispy Kreme Doughnut Co.*, 346 F. Supp. 1102, 1105 (M.D.N.C. 1972). However, Defendants did not establish by a preponderance of the evidence that Plaintiffs increased sales to customers. The evidence reflected that chain stores were not making additional commitments as a result of the actions of Plaintiffs, but rather were simply replenishing stock (which, again, had been negotiated by others). (*See, e.g.*, ECF No. 230 at 53 (Mr. Ramsawaksingh testifying that in stock conditions determine how much of a product will be sold); ECF No. 230 at 96 (William Pinkney testifying that sales representatives order more product as the store needs it and that "[t]he amount he orders is based on what he needs to fill the shelves"); *see also* ECF No. 231 at 61 (Mr. Gervacio testifying that "[i]f the space is empty, you order, if not you don't").) Of course, the evidence at trial established that the way stock is replenished at the chain stores is through sales representatives' orders through PDA devices, but "[t]he fact that the plaintiffs hit the order buttons on their electronic devices . . . is not enough to magically transform their jobs from inventory management to 'sales.'" *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 584 (6th Cir. 2014).[5]

---

[5] The Court appreciates the various reasons Defendants argue that *Killion* is distinguishable from this case. (*See* ECF No. 332 at 15–16.) The Defendants made largely the same arguments previously. (*See* ECF No. 258 at 77–78 (closing arguments).) However, the Court still finds this principle from the case applicable here.

In short, the evidence reflects that Plaintiffs did not make their own sales to chain stores, and it shows that Plaintiffs' duties—such as ordering products, stocking products, removing damaged or expired products, and cleaning shelves—did not constitute exempt sales work, given that "promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work." 29 C.F.R. § 541.503(a). The evidence reflects that this work was performed incidental to others'—not Plaintiffs'—sales work. Thus, while there was some evidence in the record that would tend to show that Plaintiffs could make sales at chain stores, the Court finds that Defendants did not prove by a preponderance of the evidence that Plaintiffs did make (or even could make) sales at chain stores.

## B. Primary Duty

The Court also concludes that Defendants have not proven by a preponderance of the evidence that Plaintiffs' primary duty was making sales at either independent or chain stores.

The Court first turns to chain stores. Even if the Court were to find that Plaintiffs did or could make sales at chain stores, such sales activity was not Plaintiffs' primary duty. Rather, the evidence reflects that Plaintiffs were primarily responsible for inventory management, including ordering products based upon sales made by others and servicing stores (including keeping shelves full and clean, and placing replenishment orders).

The evidence at trial reflected that Plaintiffs—and sales representatives generally—spent very little time on activity that could be considered "selling" at chain stores and instead spent most of their time on activities such as ordering replenishment stock and cleaning and organizing shelves. (*See, e.g.*, ECF No. 231 at 50–51 (Mr. Gervacio testimony reflecting that he spends hours at each store unpacking and conditioning shelves); *id.* at 45–59 (Mr. Gervacio describing the tasks he performs in a typical week, including, for example, "spend[ing] the whole day packing," which

13

is stocking shelves, on Tuesdays); ECF No. 254 at 100–111 (Mr. Carrera describing the tasks he performs in a typical week, including, for example, exclusively packing out several stores on Mondays).) In a similar vein, the evidence also reflects that the Plaintiffs simply could not engage in selling activity, given the amount of time they spent on other activities. (*See, e.g., id.; see also* ECF No. 231 at 63 (Mr. Gervacio testifying that he is "limited by time" given the pack-outs he was required to do, and that he has been able to develop sales "[o]n some rare occasions" but that "has not been possible mostly").)

In addition, certain chain store representatives testified that there could sometimes be limited space that store managers could allocate to additional amounts of already-approved products. (*See, e.g.,* ECF No. 249 at 57 (Mr. Krawchuck testifying that "sometimes, not a lot of times," there is some floor space to which a store manager can allocate product and that a store manager has discretion to order additional products); ECF No. 230 at 14 (Mr. Ramsawaksingh testifying that there is very little flexibility in his store, and that there is non-planogrammed space only in the "racetrack" around the store).) However, even if Plaintiffs could sell products to fill those spaces, as this testimony reflects, these sales would be sporadic and infrequent. The sales were marginal and would represent only a very small fraction of the overall sales of that product (which, as discussed above, were negotiated by employees other than Plaintiffs).

Thus, in short, the evidence reflected that—even if Plaintiffs could make sales at chain stores—they did not have the time to do so, the time doing so was dwarfed by other responsibilities, and any sales would be marginal.

In addition, the evidence at trial established that EMD's commission structure and disciplinary policies reflected that making sales was not a primary responsibility of the sales representatives. EMD's commission scheme for sales representatives did not distinguish between

14

replenishment orders for sales negotiated by EMD management and orders beyond those sales. (*See* ECF No. 248 at 113.) The evidence also established that sales representatives did not have any quotas with respect to opening new accounts or procuring additional sales. (*See* ECF No. 255 at 74–75 (Mr. Carrera testifying that sales representatives were not evaluated on opening new accounts and did not have a quota for opening new accounts, and that he had never been disciplined for failing to open stores).)

Further, the evidence at trial established that sales representatives would generally be disciplined for overstocking product and for failing to carry out duties such as stocking and cleaning shelves, but not for failing to "make sales." (*See, e.g.*, ECF No. 255 at 62–66 (Mr. Carrera testifying that he had been disciplined for failing to service a store properly); ECF No. 248 at 108 (Mr. Urdaneta testifying that employees are evaluated on credits to customers).) In fact, one sales representative had been counseled for having products on the shelves that were not approved. (ECF No. 234 at 32 (Mr. Barreno testifying that Giant had complained about him for placing unauthorized product on shelves).) In short, the evidence suggests that, even from Defendants' perspective, selling was not the primary duty of the sales representatives. This evidence also undercuts Defendants' assertion that Plaintiffs were simply bad at their sales jobs.

The Court again concludes that, "[t]his suggests that, although EMD would undoubtedly welcome the efforts of its sales representatives to sell products beyond the planogrammed spaces in chain stores, such efforts are ancillary to sales representatives' primary responsibility: ensuring that EMD receives the full benefit of the bargain obtained by EMD's key account managers and management." (ECF No. 219 at 13.) Thus, even if Plaintiffs could or did "make sales" at chain stores, such selling activity was not Plaintiffs' primary duty at such stores.

There is a closer question with respect to independent stores, but the Court also finds that making sales was not Plaintiffs' primary duty at those stores either.

As an initial matter, the evidence reflects that, while sales representatives sometimes established the relationship with independent stores, the initial relationship and the sales themselves were often negotiated by other EMD employees. (*See, e.g.*, ECF No. 253 at 14, 22 (Mr. Gervacio testifying that he serviced the Clifton Park Exxon station because "[t]he company put it on the PDA system" and it was the route the company provided him and that, with respect to opening new stores, "Ramon would call us and tell us to go visit the store, saying that they had already spoken with them, that all we had to take with us was the application"); ECF No. 254 at 93 (Mr. Carrera testifying that "I received a call from the customer" and that the customer "told me that Mr. Ramon Pagan gave the customer my number, because I was in the area. And the customer said he needed the tortillas.").)

Further, the evidence reflects that Plaintiffs' duties with respect to independent stores were largely limited to placing orders for products, not selling products. (*See, e.g.*, ECF No. 253 at 16 (Mr. Gervacio testifying that, with respect to an independent store, that "they would give me the order with the products that were already established in the store"); ECF No. 256 at 5 (Mr. Muro testifying that, although he would provide information to independent stores about available products, "they already knew what they needed, what they had to buy, because the stores were very small and they already knew what they had to buy, for example, tortillas or frijoles").)

Thus, although Plaintiffs could make sales at independent stores, such activity was not their primary duty there.

16

Finally, even if the Court were to find that Plaintiffs' primary duty with respect to independent stores was to make sales, the Court would still conclude that Plaintiffs' *overall* primary duty was not to make sales.

The evidence reflected that the vast majority of Plaintiffs' time was spent at chain stores, not at independent stores. (*See, e.g.*, ECF No. 254 at 96–97 (Mr. Carrera testifying that he spends 15 minutes a week for each of the independent stores he serviced, and that he only serviced four independent stores); ECF No. 231 at 60 (Mr. Gervacio testifying that he spends about 30 minutes, or an hour if the person who places the order is busy, at an independent store).) Even Ms. Devarie testified that Plaintiffs spent more than half of their time at chain stores. (*See* ECF No. 232 at 48–49.) Similarly, beyond simply the amount of time, the evidence reflected that the vast majority of Plaintiffs' efforts were directed at chain stores, rather than independent stores. (*See, e.g.*, ECF No. 333 at 29 (summarizing the evidence regarding the percentage of Plaintiffs' sales at chain stores, and showing that the average percentage of the total order volume chain stores was between 87.99 and 91.78 for Mr. Carrera, 70.98 and 76.85 for Mr. Gervacio, and 83.95 and 83.51 for Mr. Muro); ECF No. 231 at 45–59 (Mr. Gervacio describing the tasks he performs in a typical week); ECF No. 254 at 100–11 (Mr. Carrera describing the tasks he performs in a typical week).)

For the foregoing reasons, the Court concludes that Defendants did not show by a preponderance of the evidence that Plaintiffs' primary duty was making sales. Thus, the Court concludes that judgment should again be entered in favor of Plaintiffs.

**IV.    *Liquidated Damages***

With respect to liquidated damages, the Court previously found that "Defendants have failed to carry their 'substantial burden' of demonstrating good faith or objectively reasonable grounds." (*See* ECF No. 219 at 15.) Defendants also ask that, in the event that the Court again

rules in favor of Plaintiffs, the "Court exercise its discretion and not award liquidated damages or award a *de minimis* amount." (ECF No. 332 at 7.) Defendants explain that "[a]t all times, EMD behaved in good faith and, at a minimum, reasonably believed that this 'close question' of the exemption—which was negotiated and agreed to by Employees' union representatives—was in compliance with the FLSA." (*Id.*)

The Court will not reconsider the question of liquidated damages, and begins with a brief recitation of this case's appeal history to explain why. The parties appealed this case to the Fourth Circuit. As that court explained, the Defendants "challeng[ed] the district court's liability finding and its award of liquidated damages, and the plaintiffs cross-appeal[ed] the court's willfulness finding and attendant application of the two-year statute of limitations." *Carrera*, 75 F.4th at 348. The Fourth Circuit "affirm[ed] the district court's judgment in all respects." *Id.* In particular, that court concluded that, with respect to liability, "we are bound to conclude that the district court properly applied the law of this circuit in requiring the defendants to prove their entitlement to the outside sales exemption by clear and convincing evidence." *Id.* at 353. The Fourth Circuit also affirmed this Court's decision with respect to liquidated damages. *Id.* at 355. The liability standard of proof issue was the only question addressed by the Supreme Court. The Supreme Court, as already discussed above, concluded that "that the default preponderance standard governs when an employer seeks to prove that an employee is exempt under the Fair Labor Standards Act." *E.M.D. Sales*, 604 U.S. at 52. The Supreme Court then "reverse[d] the judgment of the Court of Appeals and remand[ed] the case for further proceedings consistent with this opinion." *Id.* at 54. In turn, the Fourth Circuit "remanded to the district court." (ECF No. 322.)

Nothing in that procedural history and nothing in the decisions of the Court of Appeals or the Supreme Court gives the Court any reason to disturb its prior findings with respect to liquidated

damages. The Court sees no reason to revisit that conclusion (which, again, was affirmed by the Court of Appeals). In short, the Court will not permit the parties to use the remand of this case to relitigate issues other than the exemption, and the Court indicated as much in its order seeking additional briefing. (*See* ECF No. 325 ("As required, [the Court] will reexamine the evidence under the preponderance standard, and it will reconsider *whether Defendants have met their burden of proving the applicability of the outside-salesperson exemption*." (emphasis added).)

## V.    *Conclusion*

For the foregoing reasons, the Court concludes that Defendants have not proven by a preponderance of the evidence that the outside-salesperson exemption applies to the Plaintiffs. Plaintiffs seek that the Court again "enter judgment in favor of Plaintiffs and against Defendants, jointly and severally, based on Plaintiffs' undisputed estimated unpaid wages owed, award Plaintiffs liquidated damages in an amount equal to their unpaid wages, and affirm the judgment (previously entered at ECF No. 295) against Defendants for attorneys' fees and costs." The Court will vacate its prior orders entering judgment, and enter a new judgment consistent with this Memorandum.

DATED this 31 day of ~~August,~~ July 2025.

BY THE COURT:

James K. Bredar
United States District Judge

19